IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | No. 31523-1-III |
| JEANNIE KILE, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | PUBLISHED OPINION |
| | ) | |
| GORDON B. KENDALL, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — In this appeal from the judgment dissolving his marriage to Jeannie Kile, Gordon Kendall challenges the trial court's characterization of farm ground and equipment that Ms. Kile acquired during the marriage as "a married person dealing in her sole and separate property," but that was used in a farming operation that he thereafter ran. He also challenges the court's refusal to award him spousal maintenance and attorney fees.

Substantial evidence supports Ms. Kile's position that her late father wished to lease his farm ground and equipment to her as her separate property and that Mr. Kendall

was on notice for over 20 years that leases executed by his father-in-law were explicitly to Ms. Kile alone. Yet it is undisputed that lease terms offered by Ms. Kile's father were fair market terms supported by consideration, that Ms. Kile had no separate assets, employees, or credit with which she could independently perform the lessee's obligations at the time she entered into the leases, and that Mr. Kendall and the community necessarily bore burdens and risks in performing the lease obligations. While Ms. Kile's father made gifts to his daughter in the form of payments to third parties and forgiveness of debt that the court could legitimately treat as separate property and that supported the separate character of 317 acres of farm ground purchased by Ms. Kile (at least at the inception of that purchase), the court erred by failing to recognize that the community had a material interest in the farming operation and its assets.

We find no abuse of discretion by the court in denying Mr. Kendall spousal maintenance or an award of attorney fees. We deny Mr. Kendall's motion for relief from the deadline for requesting attorney fees on appeal. Because the trial court's distribution of the parties' assets and liabilities might have been different had the farming operation assets been correctly characterized, we reverse the property award and liability allocation portions of the decree and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

Jeannie Kile and Gordon Kendall separated in December 2011, after almost 28 years of marriage. The parties have two adult children. For most of their married life,

Mr. Kendall farmed 1,517 acres of ground in Thornton, Washington that was either leased or titled in Ms. Kile's name, as her separate property. The principal issue in their divorce was the separate or community character of the farming operation.

As Ms. Kile's lawyer explained to the trial court in opening statement, his client's father, Lester Kile, had farmed considerable acreage in Thornton for years, until losing half of the property to his son in a "tough divorce" from Ms. Kile's mother, in which the son intervened and successfully claimed a contractual interest in his parents' property. Report of Proceedings (RP) at 13. Mr. Kile was left owning 1,200 acres. As explained by Ms. Kile's lawyer and later demonstrated by evidence, Mr. Kile was "very, very interested and desirous—it was his hope that the farm would be left to Jeannie Kile . . . and her children, Cody and Carly." *Id.*

In 1988, Mr. Kile approached his daughter and offered to lease his farm ground to her on crop share basis: Ms. Kile would pay her father one-third of the proceeds of crops grown as rent, and retain two-thirds as operator. This was a standard crop sharing rate for dryland wheat farming in Eastern Washington. It was anticipated that Mr. Kendall would actually run the farm operations. But Mr. Kile insisted on leasing the ground to his daughter, as her separate property. The lease agreements prepared for execution by Ms. Kile, Mr. Kile and his farming corporation, Kile Farms, Inc., identified the ultimate lessee as "JEANNIE KILE KENDALL, a married person dealing in her sole and separate property." Clerk's Papers (CP) at 9.

3

At the time the lease was offered, both Mr. Kendall and Ms. Kile were salaried employees of a former brick-and-mortar retailer, Montgomery Ward. Initially Mr. Kendall worked on the farm part time with his father-in-law, learning the farm operation. In 1990 Mr. Kendall left his job at Montgomery Ward to work full time on the farm.

At or about the same time that he leased his farm ground to Ms. Kile, Mr. Kile agreed to lease his equipment to her, with an option to purchase. In a perpetuation deposition admitted at trial, Mr. Kile testified that there had been a written agreement setting the payments required, that the lease was solely with his daughter, and that Mr. Kendall was "not on there at all." CP at 378. Both Ms. Kile and her father testified that over the term of the equipment lease, Mr. Kile was paid most of what he was owed, but if Ms. Kile and Mr. Kendall were "hard up" her father would "give them some slack" and he ultimately forgave some of the payments due under the equipment lease. CP at 379. Mr. Kile estimated that he accepted "around [$]50,000" less than what he was owed, as "a forgiveness to Jeannie Kile." *Id.*

In 1989 two parcels of farm ground that Mr. Kile did not own but that he had leased and farmed for 30 years were offered to him for purchase by the owners, Everett and Sally Flood. Mr. Kile encouraged Ms. Kile to purchase the parcels, which totaled 317 acres. He offered to make the required down payments. Ms. Kile testified that "Dad and I decided this would be a good deal and a way to keep it in the family." RP at 103. The real estate contracts and notices of the contracts identified the purchaser of the

4

properties as "Jeannie Kile, as her separate property," or "JEANNIE KILE KENDALL, wife of Gordon B. Kendall . . . dealing in her own separate property." CP at 20, 25. Contemporaneous with Ms. Kile's purchase of the parcels, Mr. Kendall executed a quit claim deed "to release community property interest," to which was attached copies of the Flood sale documentation. Mr. Kile paid a total down payment of $40,000 on the parcels. According to Mr. Kile, he gifted the down payments to his daughter "with the intent that [the parcels] would be her separate property." CP at 414. Mr. Kendall farmed the Flood land just as he farmed the land that Ms. Kile leased from her father.

Business and accounting records for the farms reflected its operation as Ms. Kile's sole proprietorship. A separate bank account was maintained for farm operations. Ms. Kile was listed as the operator of farming operations with the Farm Service Agency (FSA) office and all farm subsidy checks were made payable to her alone. During the marriage, all revenue generated from farming operations was deposited into the farm account, and all farm expenses were paid out of the farm account.

Ms. Kile issued forms W-2 to Mr. Kendall reflecting the wages he paid himself; they identified her as the "employer," and Mr. Kendall as an "employee." CP at 71. Ms. Kile's earnings from her employment were deposited to a different, community bank account, as were the wages that Mr. Kendall paid himself from farm operations.

Despite Ms. Kile's being reflected on business records as the owner, employer and operator of the farm, Mr. Kendall was its hands-on operator, at least following the initial

years that he worked with his father-in-law and until the parties' son became active in farm operations many years later. Although Ms. Kile was listed as the farm operator with the FSA, she executed a power of attorney that authorized Mr. Kendall to file reports and otherwise deal with the FSA on her behalf. Mr. Kendall testified that Ms. Kile never worked at the farm. She did not disagree; her own evidence was that she had a full-time job elsewhere and she offered no evidence that she expended any community labor in the farming operation.

Shortly after Ms. Kendall filed for divorce, her father sent a notice terminating the farm lease agreement, expressing dissatisfaction with Mr. Kendall's performance and asking that Ms. Kile turn over the farming operation to the parties' son, Cody Kendall. Ms. Kile's lawyer conducted a perpetuation deposition of Mr. Kile on January 24, 2012. Mr. Kile died on March 30, 2012, leaving his farm ground in a trust in which Ms. Kile and Cody have beneficial interests.

In the 3-day dissolution trial conducted in September 2012, Mr. Kendall did not claim any interest in Ms. Kile's inheritance from her father, but he did claim that the operation of the farm had been a community endeavor and that the assets purchased from farm revenues—the farming equipment and the 317 acres of farm ground purchased from Everett and Sally Flood—were therefore community property. Ms. Kile argued that the farm and all of the farming assets whose acquisition could be traced to farm profits were her separate property.

6

Ms. Kile contended at trial that Mr. Kendall's historical operation of the farm was inconsequential in determining the character of the property because he was paid a reasonable wage from the farm account. The evidence on this score consisted of Ms. Kile's testimony that her husband was "paid fairly" for his efforts, RP at 89, and Mr. Kendall's deposition testimony that the farm paid him a reasonable wage—although elsewhere in his deposition, when he was asked, "Did you pay yourself fairly?" he answered, "That's a relative question. To be honest with you, I think the family was compensated fairly for the services that I provided." RP at 485, 510. No evidence of market wages or benefits for a person of Mr. Kendall's experience performing custom dryland wheat farming in Eastern Washington was presented.

A summary of Mr. Kendall's W-2 earnings revealed that between 1991 and 2010, he drew gross wages of between $22,209 and $48,500, with an exception in 2008, when he drew $60,000. When asked how Mr. Kendall's monthly wage was determined, Ms. Kile testified, "He decided that he had -- he was managing, again, the farm. Basically I trusted him to do what was good for the farm, and he paid himself whatever he decided." RP at 318.

Both parties testified that Mr. Kendall had cashed in his Montgomery Ward retirement account early in the farm operation to pay taxes or other expenses of the farm. They differed as to the amount. Mr. Kendall offered records showing that he took retirement distributions of $30,924 in 1990, while Ms. Kile testified to figures of $15,000

7

or $20,000. Ms. Kile presented evidence that by the end of 1992, Mr. Kendall had an individual retirement account worth $17,607 and she contended that when their finances permitted, Mr. Kendall reimbursed himself for the retirement assets he had used for farm expenses. She characterized his use of his retirement assets to pay expenses in 1990 as a "convenience," rather than a contribution. RP at 317. Both parties agreed that Mr. Kendall had been required to co-sign a purchase/loan agreement to acquire a combine, but Ms. Kile testified that she had no intention that the combine would thereby be a community asset.

Ms. Kile presented the testimony of an expert witness who had performed a cash flow analysis of farm operations demonstrating that the cash flow from farm operations between 1989 and 2010, all of which was deposited to the farm account, was more than sufficient to pay Mr. Kile his crop share under the lease, all unforgiven equipment lease payments, all of the contract installments for the purchase of the Flood property, and all other farm expenses.[1]

The trial court ultimately found that the farm operation had been Ms. Kile's separate property from its inception, and, because there had been no commingling of farm and community revenues, the farm equipment and the Flood property—traceable to

---

[1] Ms. Kile stipulated that personal expenditures had been made out of the farm account for personal items and household expenses.

8

those revenues—was also her separate property. It awarded Mr. Kendall the vast majority (about 80 percent) of the parties' community property.

The trial court rejected Mr. Kendall's request for spousal maintenance. In announcing its decision following the trial, the court recounted the statutory factors that it was required to consider, observed that Mr. Kendall had offered only vague support for maintenance, and explained that its disproportionate award of the parties' community property to Mr. Kendall adequately addressed any demonstrated need.

Mr. Kendall's motion for reconsideration was denied. He appeals.

## ANALYSIS

Mr. Kendall appeals both the dissolution decree and the trial court's denial of his motion for reconsideration. He assigns error to (1) the trial court's characterization of the profit from farming operations, the farm equipment, and the Flood properties as Ms. Kile's separate property; (2) its refusal to award him spousal maintenance; and (3) its refusal to order Ms. Kile to pay his attorney fees and costs.

We address the issues in turn.

### I. Characterization of farming profits, farm equipment, and the Flood property

Mr. Kendall assigns error to virtually all of the trial court's findings of fact and conclusions of law bearing on its determination that the results of farming operations, the farm equipment, and the Flood properties are Ms. Kile's separate property.

9

He asserts several broad challenges: that the court erred in treating Mr. Kile's offer of a market-rate lease as a gift to Ms. Kile rather than a community endeavor; that it failed to take into account the fact that Mr. Kendall never agreed to change the character of property acquired during the marriage from community to separate; that Ms. Kile's separate funds, if any, were insufficiently traceable to overcome the presumption that proceeds from separate property that are commingled with community funds become community property; and that the trial court failed to recognize the fiduciary duty he was owed in his dealings with Ms. Kile. We find the first and second challenges to be dispositive.

In performing its obligation to make a just and equitable distribution of properties and liabilities in a marriage dissolution action, the trial court must characterize the property before it as either community or separate. *In re Marriage of Gillespie*, 89 Wn. App. 390, 399, 948 P.2d 1338 (1997); *Pollock v. Pollock*, 7 Wn. App. 394, 399, 499 P.2d 231 (1972). The status of the property is determined "as of the date of its acquisition." *In re Marriage of Shannon*, 55 Wn. App. 137, 140, 777 P.2d 8 (1989).

Because Washington law favors community property, "all property acquired during marriage is presumptively community property, regardless of how title is held." *Dean v. Lehman*, 143 Wn.2d 12, 19, 18 P.3d 523 (2001); RCW 26.16.030. "The burden of rebutting this presumption is on the party challenging the asset's community property status, and 'can be overcome only by clear and convincing proof that the transaction falls

10

within the scope of a separate property exception.'" *Id.* at 19-20 (citation omitted) (quoting *Estate of Madsen v. Comm'r*, 97 Wn.2d 792, 796, 650 P.2d 196 (1982), *overruled in part on other grounds by Aetna Life Ins. v. Wadsworth*, 102 Wn.2d 652, 659-60, 689 P.2d 46 (1984)).

A trial court's characterization of property as separate or community presents a mixed question of law and fact. *In re Marriage of Martin*, 32 Wn. App. 92, 94, 645 P.2d 1148 (1982). "The time of acquisition, the method of acquisition, and the intent of the donor, for example, are questions for the trier of fact." *Id.* at 94. We review the factual findings supporting the trial court's characterization for substantial evidence. *In re Marriage of Mueller*, 140 Wn. App. 498, 504, 167 P.3d 568 (2007). The ultimate characterization of the property as community or separate is a question of law that we review de novo. *Id.* at 503-04.

Mr. Kendall challenges the trial court's characterization of the April 1988 leases of Mr. Kile's farms to his daughter and the profits from farming the leased ground as Ms. Kile's separate property.

Notwithstanding the fact that Ms. Kile was named as the sole lessee under both farm leases, we begin with the required presumption that any property interest acquired by Ms. Kile during marriage was a community interest. The burden was on her to demonstrate, clearly, that the leases and the profits derived from operating under them were her separate property. Separate property includes property acquired either before

11

marriage, or—relevant here—property acquired after marriage by "gift, bequest, devise, descent, or inheritance" or with "the rents, issues and profits thereof." RCW 26.16.010.

### 1. Separate property by gift

Ms. Kile asserts that the farm leases were gifts to her from her father. She contends that no consideration was paid for the farm leases and that she, "as donee," and her father, "as donor," both intended that the leases would be her separate property. Br. of Resp't at 9. A gift "is a voluntary transfer of property without consideration." *City of Bellevue v. State*, 92 Wn.2d 717, 720, 600 P.2d 1268 (1979) (citing *Andrews v. Andrews*, 116 Wash. 513, 521, 199 P. 981 (1921)). While the court's findings and conclusions did not explicitly state that Mr. Kile's leases to his daughter were a "gift," it found that Mr. Kile "intended that his daughter alone would have the sole benefit of the lease[s] . . . on the farm ground," and that "[n]o consideration was paid for these leasehold interests." CP at 537-38.

But there *was* an exchange of consideration for Ms. Kile's rights under the farm leases. "[I]nherent in [the] concept [of a gift] is the necessity of a donative intent," *City of Bellevue*, 92 Wn.2d at 720, but if a contract is supported by mutual consideration—as the farm leases were—a professed donative intent does not transform a contract into a gift. This was recognized by our Supreme Court in *Andrews*, 116 Wash. 513, in which a husband entered into an agreement with his elderly father under which the son would care for and support his parents in consideration of which the father would leave property to

his son when he died. *Andrews*, 116 Wash. at 514. The court held that the property the husband was to acquire under the contract was community property, since it was not acquired by gift as defined by a former version of the separate property statute. *Id.* at 520.[2] It explained that "[t]he 'gift, bequest, devise or descent' contemplated by the statute as constituting separate property is not based upon contract or consideration." *Id.* at 521.

Under the farm leases between Mr. Kile and his daughter, he received a third of the revenue from the farming operations in exchange for use of his land, while Ms. Kile received two-thirds in exchange for performing the duties and assuming the risks required to generate the crop proceeds that they would share. It is undisputed that this was a standard crop sharing arrangement for dryland wheat farming in Eastern Washington. It may be true that for reasons of his own, Mr. Kile would not have entered into the same lease with Ms. Kile and Mr. Kendall jointly that he was willing to enter into with his daughter alone. But that does not alter the fact that offering a contract on market terms is not a gift. The trial court's finding that "[n]o consideration was paid for [the farm] leasehold interests" is not supported by the evidence. CP at 537-38 (finding 1).

### 2. *Separate property by purchase*

---

[2] Section 5915 defined a husband's separate property as that "owned by the husband before marriage, and that acquired by him afterwards by gift, bequest, devise or descent, with the rents, issues, and profits thereof." REM. 1915 CODE § 5915.

The court in *Andrews* explained that the property the husband was to acquire under his father's will might have been his separate property had the husband been able to establish "that the contract was a personal one between his father and himself and was to be performed, and was performed, by means of his separate property and his individual endeavors." *Andrews*, 116 Wash. at 521. It nevertheless emphasized that "even in that instance, it would be his separate property *by purchase*, and it would not have been his by *gift, devise or descent* within the spirit of the statute." *Id.* at 521-22 (emphasis added).

Ms. Kile implicitly takes the position that if her father's lease of farm land was not a gift to her, then she acquired it by purchase within the meaning of *Andrews* because it was a personal contract with her father and was to be performed, and was performed, by means of her separate property and individual endeavors. It was presumably to this end, in part, that she presented evidence that Mr. Kendall was paid a fair wage as her employee and expert testimony that, looking back, her farm operation had been able to pay its own way.

In order to qualify as separate property under RCW 26.16.010, however, any property acquired after marriage that is not acquired by gift, bequest, descent, or inheritance must be "the rents, issues and profits" of separate property. Where a husband or wife *has* separate property, the statute recognizes his or her authority to manage it "as fully, and to the same extent or in the same manner as though he or she were unmarried." RCW 26.16.010. Management includes putting separate property to use to generate

14

rents, issues, and profits, and would include the right to conduct a farming operation using separate property.

Here, however, Ms. Kile did not have a farming operation that pre-dated the marriage, nor did she have other separate property that could be used to capitalize a farming operation. Instead, she performed farming operations on the ground leased from her father as an uncapitalized sole proprietorship. It was expected that Mr. Kendall would be the farm operator. Lacking separate property with which to capitalize her farming enterprise, Ms. Kile trusted Mr. Kendall to pay himself a wage based on "what was good for the farm." RP at 318. She allowed him to cash in community retirement assets as needed to finance farm expenses (even if those retirement assets were restored at a later time). She allowed him to co-sign for loans when lenders required his signature.

A spousal enterprise conducted on this basis does not qualify as separate property of a spouse under the exclusive criteria provided by RCW 26.16.010. *Cf. U.S. Fidelity & Guar. Co. v. Lee*, 58 Wash. 16, 107 P. 870 (1910) (wife's endeavor was her separate property where she had money sufficient to perform her obligations and intended to do so without assistance from her husband). Rather, it falls well within what the late Professor Cross has characterized as "[t]he fundamental premise of the community property system that both spouses contribute to property acquisitions in a joint effort to promote the welfare of the relationship." Harry M. Cross, *The Community Property Law*, 61 WASH. L. REV. 13, 27 (1986). Ms. Kile's evidence did not overcome the presumptively

15

community character of the farm lease. The trial court's remaining findings do not support its conclusion that "[t]he farm leases . . . are [Ms. Kile's] separate property." CP at 540 (conclusion 1).

Ms. Kile conceded at trial that the parties never executed any joint property agreement that would change the legal character of the farm lease and its profits from community to separate property. The trial court erred, then, in treating the profits from farming ground leased from Mr. Kile as Ms. Kile's separate property.

## A. Equipment lease

Ms. Kile's evidence that the equipment lease was a separate rather than a community undertaking falls short for the same reason as her argument that farming land leased from her father was a separate undertaking: from the inception of the lease, she had no separate property or rents, issues, and profits with which to independently perform the lessee's obligations.

Under the "inception of title" theory, property that is acquired through a contractual obligation is deemed to be acquired when the obligation becomes binding. *Beam v. Beam*, 18 Wn. App. 444, 452, 569 P.2d 719 (1977); *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). The only evidence that Ms. Kile could offer as to the separate character of the equipment lease at the time she entered into it with her father was that she alone was the contracting party. That, without more, is insufficient. As our Supreme Court observed in *Borghi*, a case involving title to real property:

16

'[T]he fact in itself [legal title] is not of controlling moment in determining which of the spouses is the actual owner of the property.

Under our somewhat perplexing statutes relating to the acquisition of property, title to real property taken in the name of one of the spouses may be the separate property of the spouse taking the title, the separate property of the other spouse, or the community property of both of the spouses, owing to the source from which the fund is derived which is used in paying the purchase price of the property.'

*Id.* at 488 (quoting *Merritt v. Newkirk*, 155 Wash. 517, 520-21, 285 P. 442 (1930)). The court in *Merritt* characterized the instances in which the court had held that property purchased with community funds was property of the community despite title having been taken in the name of one spouse as "too numerous to admit of citation here." *Merritt*, 155 Wash. at 521.

More important than title was the trial court's finding, supported by the evidence, that all payments made on the equipment lease "were made from the farm account." CP at 538 (finding 6). Given our holding that the profits from operating the leased farm ground were community profits, all payments on the equipment lease were therefore made by the community.

The trial court's finding that "[n]o community funds were utilized to pay on [the equipment lease]" was based on its erroneous treatment of the farm revenues as Ms. Kile's separate property; it is not supported by the evidence. CP at 538 (finding 6). Given the community's payment of amounts required by the equipment lease from its inception, Ms. Kile's evidence was insufficient to rebut the presumptively community

17

character of the equipment lease. The trial court's remaining findings do not support its conclusion that "[t]he equipment leases . . . as well as the equipment purchased pursuant to this contract, are Ms. Kile's separate property." CP at 540 (conclusion 2).

Nonetheless, the trial court found, based on sufficient evidence, that "[t]he ultimate balances due under the [equipment lease] were forgiven by Mr. Lester Kile, as a gift to his daughter." CP at 538 (finding 6). Both Mr. Kile and his daughter testified that he forgave payments owed under the lease; he testified that the amount forgiven was $50,000. The donor's intent at the time he gives a gift controls whether the gift is community or separate. *Borghi*, 167 Wn.2d at 487; *In re Estate of Deschamps*, 77 Wash. 514, 518, 137 P. 1009 (1914). Mr. Kile testified that the equipment lease was only between himself and his daughter and that Mr. Kendall "was never involved." CP at 380. He testified that he treated the forgone $50,000 as a "forgiveness to Jeannie Kile." *Id.* at 379. Because Mr. Kile entered into the equipment lease solely with his daughter and testified that in forgiving payments he intended and believed that he was making a gift to her, the trial court had a sufficient basis for its finding that balances due were forgiven as a gift to Ms. Kile.

Mr. Kendall nonetheless argues that there is a rebuttable presumption that property acquired with separate funds during the marriage is a gift to the community. *In re Marriage of Chumbley*, 150 Wn.2d 1, 5 n.1, 74 P.3d 129 (2003). But both Ms. Kile and her father testified that when he forgave $50,000 of the amount owed on the equipment

18

lease, they believed he was making a gift to her alone. That evidence is sufficient to rebut any presumption of a gift to the community.

The court erred in treating the equipment acquired through the equipment lease as Ms. Kile's separate property. But its findings support Ms. Kile's right to be reimbursed $50,000 for her separate contribution to the purchase price. *In re Marriage of Sedlock*, 69 Wn. App. 484, 508, 849 P.2d 1243 (1993).[3]

### B. The Flood property

Turning to the two parcels of farm land purchased from Mr. and Mrs. Flood, we again begin with the presumption that property acquired by Ms. Kile during marriage was a community interest. In this case, however, Ms. Kile's evidence satisfies her burden of demonstrating that at the time of acquisition, the Flood ground was her separate property.

We again apply the "inception of title" theory. Undisputed evidence supports the trial court's findings that "[t]he conveyancing Deeds reflect that Ms. Jeannie Kile purchased the ground in her name alone as her separate property." CP at 538 (finding 10). While that alone would not be enough, substantial evidence also supports its finding that "[t]he down payments on each acquisition of the Flood ground were made from funds gifted by Mr. Lester Kile to Ms. Jeannie Kile." *Id.* The down payments were

---

[3] *Sedlock* deferred the issue of entitlement to interest to the trial court, as do we. *Id.* 69 Wn. App. at 508 n.19. *Cf.* Cross, *supra*, at 71 (recognizing that an interest factor may be appropriate, depending upon circumstances).

material, amounting to almost 14 percent of the aggregate price of the properties. Undisputed evidence supports the trial court's finding that Mr. Kendall executed contemporaneous quit claim deeds, which are additional evidence of the properties' separate character. *In re Estate of Carmack*, 133 Wash. 374, 233 P. 942 (1925) (the use of a quitclaim deed is important to change, or raise the presumption of change, to separate ownership). Collectively, the evidence is enough to clearly and convincingly demonstrate that the Flood property was purchased, at its inception, "by use of the separate funds and/or the separate credit of the acquiring spouse." 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 10.2, at 134 (1997)).

"Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Borghi*, 167 Wn.2d at 484 (citing 19 WEBER, *supra* § 10.1, at 133 (1997)). Clear and convincing evidence must show the intent of the spouse owning the separate property to change its character from separate to community property. *Id.* at 484-85 & n.4 (citing *Guye v. Guye*, 63 Wash. 340, 115 P. 731 (1911)). Where real property is at issue, an acknowledged writing is generally required. *Id.* at 485 (citing Cross, *supra* at 102 & n.485).

Mr. Kendall demonstrated only that the payments on the Flood real estate contract were made from the farm account. Community property contributions that retire a

20

purchase obligation on separate property will give rise to a community right of reimbursement protected by an equitable lien, but they do not result in a transmutation of the property from separate to community property. *Merkel v. Merkel*, 39 Wn.2d 102, 114-15, 234 P.2d 857 (1951); *Borghi*, 167 Wn.2d at 491 n.7. Mr. Kendall does not show any intention on Ms. Kile's part to transmute the property.

Substantial evidence does not support the trial court's finding that "[n]o community funds were paid on the acquisition of the Flood ground" if we construe "acquisition" to mean all of the payments required by the real estate contract—and that meaning of "acquisition" is necessary to support the trial court's conclusions of law. CP at 538 (finding 11). Given the use of community funds to make most of the payments on the Flood contract, the trial court's remaining findings do not support its conclusion that "[t]he Flood ground was purchased with Ms. Kile's separate property." CP at 540 (conclusion 6).[4] They support its conclusions that the Flood ground "is [Ms. Kile's] separate property" or that it "has been [her] separate property since it was purchased" only if it is recognized at the same time that the community has a right of reimbursement and equitable lien to the extent payments were made with community funds. CP at 540 (conclusions 6 and 7).

---

[4] Any separate character that proceeds from farming the Flood ground might have had if its operations had been segregated and separately financed after the date it was purchased was lost through its joint operation, and the commingling of its proceeds and expenses with the pre-existing, larger, community-owned farm operation.

21

Substantial evidence does not support the trial court's fourth finding, that the farm account was not used as a depository for any community income and that no community income was commingled in that account. The trial court's remaining findings do not support its third and fifth conclusions of law, characterizing the farm revenue in the farm account and all farm equipment as Ms. Kile's separate property.

### 3.    Remand

Although the character of the property is not controlling, remand is required where "it appears the trial court's division of the property was dictated by a mischaracterization of the separate or community nature of the property." *In re Marriage of Skarbek*, 100 Wn. App. 444, 450, 997 P.2d 447 (2000); *In re Marriage of Kraft*, 119 Wn.2d 438, 449, 832 P.2d 871 (1992). In such cases, "[r]emand enables the trial court to exercise its discretion in making a fair, just and equitable division on tenable grounds, that is, with the correct character of the property in mind." *Shannon*, 55 Wn. App. at 142.

It is not clear in this case that the court would have divided the property the same way had the assets been properly characterized. Under these circumstances, remand is required to enable the trial court to make a just and equitable division of the property considering its correct characterization.

### B.    Spousal maintenance

Mr. Kendall challenges the trial court's refusal to award him spousal maintenance, which he had requested if he were not allowed two to three more years to farm and

"prepare himself financially for retirement." CP at 115. In its written order, the court entered the following finding of fact regarding Mr. Kendall's need for spousal maintenance:

> Mr. Kendall is currently unemployed. The court makes no finding as to his abilities in terms of working. There is no evidence that he is particularly motivated or not motivated. He has requested spousal maintenance. He did not testify as to how much or for how long, and he did not testify for what purpose he wanted it.

CP at 539.

Based on that and other findings, the court denied Mr. Kendall's request for maintenance. It stated that it had considered the factors set forth in RCW 26.09.090, that Mr. Kendall's request was "rather vague," that he had "failed to establish a need for spousal maintenance," and that "given the fact that he is being awarded approximately 80% of the community assets," it would not order spousal maintenance. CP at 537.

Spousal support is governed by RCW 26.09.090, which provides that a court "may" grant a maintenance order for either spouse "in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors." The statute identifies a non-exclusive list of factors that includes "[t]he financial resources of the party seeking maintenance, including separate or community property apportioned to him or her," the time it would take to acquire education or training to enable that party to find appropriate employment, the standard of living established during the marriage, the duration of the marriage, the age, physical and

23

emotional condition, and financial obligations of the spouse seeking maintenance, and the ability of the other spouse to meet his or her needs while meeting those of the spouse seeking maintenance. RCW 26.09.090(1) (emphasis added). The trial court has broad discretionary powers in awarding maintenance, and its decision "will not be overturned on appeal absent a showing of manifest abuse of discretion." *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984).

Mr. Kendall argues on appeal that he should have been awarded spousal maintenance to place him in a financial position roughly equal to Ms. Kile's for the rest of his life, citing *In re Marriage of Rockwell*, 141 Wn. App. 235, 170 P.3d 572 (2007). But *Rockwell* concerned the just and equitable division and distribution of property under RCW 26.09.080, not entitlement to spousal maintenance. And RCW 26.09.090 clearly makes an award of maintenance discretionary, not mandatory. Here, the trial court awarded Mr. Kendall almost $650,000, including 80 percent of the parties' community property—an award in his favor that is even more disproportionate (had the property been correctly characterized) than the shifting of property value that was at issue in *Rockwell*. Mr. Kendall fails to demonstrate an abuse of discretion by the trial court.

That being said, a trial court is not only permitted to consider the division of property when deciding whether to award maintenance, it is required to do so. *In re Marriage of Rink*, 18 Wn. App. 549, 552-53, 571 P.2d 210 (1977). Since we are reversing the trial court's separate property characterization of certain assets and

24

remanding the property division, the trial court has the authority to revisit its decision on maintenance in arriving at a revised and just distribution of property. *See Marriage of Marzetta*, 129 Wn. App. 607, 625-26, 120 P.3d 75 (2005), *overruled on other grounds by In re Marriage of McCausland*, 159 Wn.2d 607, 152 P.3d 1013 (2007) (remanding maintenance in light of its remand of property division).

### C.    *Attorney fees*

Mr. Kendall assigns error to the trial court's failure to award him attorney fees and costs. The court refused to award attorney fees based on its finding that each party had the capacity to pay its own fees and costs. As the party challenging the trial court's refusal to award fees, Mr. Kendall bears the burden of showing that the trial court "exercised its discretion in a way that was 'clearly untenable or manifestly unreasonable.'" *In re Marriage of Crosetto*, 82 Wn. App. 545, 563, 918 P.2d 954 (1996) (quoting *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994)). He was awarded almost $650,000 in assets. He fails to show an abuse of discretion.

Mr. Kendall also asks that we order Ms. Kile to pay his fees on appeal, claiming he has a need and she has ability to pay under RCW 26.09.140. RAP 18.1 permits an award of attorney fees on appeal if applicable law permits such award; under RCW 26.09.140, we may award attorney fees on appeal after considering the financial resources of both parties. Mr. Kendall failed to submit a timely financial affidavit as

No. 31523-1-III
*In re Marriage of Kile*

required by RAP 18.1(c) but has filed a motion asking that we extend time and accept and consider his affidavit. We deny the motion.

We reverse the trial court's division of the parties' property and remand for further proceedings consistent with this opinion.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.