IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 78989-9-I |
| | ) | |
| HOVSEP MKRTCHYAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | UNPUBLISHED OPINION |
| LILIT ADAMYAN, | ) | |
| | ) | FILED: February 18, 2020 |
| Respondent. | ) | |
| | ) | |

VERELLEN, J. — Hovsep Mkrtchyan appeals the court's entry of a permanent parenting plan and division of community property. Mkrtchyan argues the court abused its discretion because it did not consider each of the RCW 26.09.187(3)(a) factors before entering the parenting plan and because it did not order an additional psychological evaluation to confirm one expert's testimony. On the record presented, Mkrtchyan fails to show the trial court abused the broad discretion it has when entering a parenting plan.

Mkrtchyan argues the court erred by classifying the couple's house as community rather than separate property because, first, the down payment for the house came solely from his separate funds and, second, his then-wife transferred her interest in the house to him in a quitclaim deed. Because substantial evidence

supports the court's findings of fact and those findings support its conclusions of law, the court did not err.

Based on the parties' financial needs and abilities to pay, we award Adamyan attorney fees on appeal.

Therefore, we affirm.

## FACTS

Hovsep Mkrtchyan had been living in Washington and working for Microsoft when he vacationed in his native Armenia and met fellow Armenian Lilit Adamyan. After a brief and mostly long-distance courtship, the two married on August 29, 2014, and Adamyan moved to Redmond with Mkrtchyan. She soon became pregnant with their son, M.M.

In September of 2015, they bought a house in Lynnwood. After M.M. was born, Adamyan was a full-time parent and homemaker, and Mkrtchyan continued working for Microsoft as a senior software developer. The couple's marriage became increasingly contentious and, on October 19, 2016, Mkrtchyan filed for dissolution.

The couple engaged in almost 20 months of acrimonious pretrial litigation. Mkrtchyan contended that Adamyan was mentally ill and a danger to their child. Adamyan contended that Mkrtchyan was abusive, using money and isolation to control her. The court appointed a guardian ad litem (GAL) to investigate the allegations and ordered both parents to undergo mental health evaluations. Dr.

Monique Brown evaluated Mkrtchyan and Adamyan, determined Adamyan was not mentally ill, and recommended therapy for both parents.

After a 10-day trial, the court granted the dissolution and entered a final parenting plan. The parents have shared decision-making authority and equal residential time with their son. As part of the plan, both parents must participate in one year of individual therapy. The court found that the couple's house was community property, although Mkrtchyan used his separate funds for the down payment. The court awarded Mkrtchyan the house and required that he pay Adamyan a $65,000 equalization payment.

Mkrtchyan appeals.

## ANALYSIS

### I. Parenting Plan

We review a trial court's decisions on the provisions of a parenting plan for abuse of discretion.[1] A court abuses its discretion where its decision rests on untenable grounds or was made for untenable reasons.[2]

Mkrtchyan argues the trial court "wholly disregarded" Dr. Brown's evaluation of Adamyan because it felt the evaluation was "not 'terribly helpful.'"[3] And, Mkrtchyan contends, disregarding the evaluation meant the court failed to consider every RCW 26.09.187(3)(a) factor before entering a permanent parenting plan.

---

[1] In re Marriage of Littlefield, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997).

[2] Id.

[3] Appellant's Br. at 34-35 (quoting Clerk's Papers (CP) at 18).

Mkrtchyan's argument rests on an inaccurate premise. The court expressly "reviewed the evaluations by the psychologists,"[4] and heard several days of testimony from the psychologists about their evaluations.[5] After doing so, the court concluded the evaluations were "interesting but . . . not . . . terribly helpful."[6] The court did not disregard Dr. Brown's evaluation but instead gave it less weight than other evidence. This is a question of credibility, and we do not review credibility determinations by the finder of fact.[7] Because the court considered Adamyan's psychological evaluation, the real issue is whether the court adequately considered the factors required in RCW 26.09.187(3)(a).

Mkrtchyan argues "the absolute lack of findings assessing the factors under RCW 26.09.187" showed the court failed to consider them.[8] But "findings are not

---

[4] CP at 18.

[5] Before Dr. Brown evaluated Adamyan, Dr. Christen Carson attempted an evaluation. Dr. Carson concluded her own results were invalid because of "five different cautions," such as Adamyan's cultural background and language skills, that potentially affected the validity of her testing. RP (June 7, 2018) at 398. Because these results were invalid and Dr. Brown had already tested Mkrtchyan, the court ordered that Dr. Brown evaluate Adamyan as well.

[6] CP at 18. The court did not explain why Dr. Brown's evaluation was not helpful, but it heard testimony from Dr. Carson strongly criticizing Dr. Brown's conclusions and methods. RP (June 7, 2018) at 444, 505-07 (testifying that Dr. Brown's conclusions about Adamyan possibly having a personality disorder were internally inconsistent and did not make sense). Dr. Carson also criticized Dr. Brown's use of a "controversial" testing protocol because "it can over-pathologize." Id. at 386, 406.

[7] Burrill v. Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

[8] Appellant's Br. at 37.

4

required when the statute requires only that the factor[s] be considered."[9] And in absence of evidence to the contrary, "we assume the trial court discharged its duty and considered all evidence before it."[10]

RCW 26.09.187(3)(a) requires that a court "consider the following factors" before entering a permanent parenting plan:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
>
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
>
> (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004[(2)], including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
>
> (iv) The emotional needs and developmental level of the child;
>
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
>
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
>
> (vii) Each parent's employment schedule, and [the court] shall make accommodations consistent with those schedules.

---

[9] Matter of Parental Rights to K.J.B., 187 Wn.2d 592, 603-06, 387 P.3d 1072 (2017).

[10] In re Marriage of Croley, 91 Wn.2d 288, 291, 588 P.2d 738 (1978); see Young v. Thomas, 193 Wn. App. 427, 443, 378 P.3d 183 (2016) ("'When evidence of those factors [in RCW 26.09.187(3)(a)] is before the court and its oral opinion and written findings reflect consideration of the statutory elements, specific findings are not required on each factor.'" (quoting In re Marriage of Murray, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981))).

The first factor must be given the greatest weight.[11]

Because the statute merely requires consideration of every factor, the record shows the parties presented extensive evidence on each factor, and the court's ruling is consistent with having reviewed the evidence presented, we conclude the court adequately considered the RCW 26.09.187(3)(a) factors.

Specifically, the court reviewed every exhibit admitted. These exhibits included each parent's psychological evaluation and several GAL reports that addressed each RCW 26.09.187(3)(a) factor. In its oral ruling, the court found "each of you love your son very much" and "want what is best for him."[12] And the GAL reported that M.M. "is attached and bonded with each parent, and each has unique qualities that they bring to the child."[13]

Considering Mkrtchyan and Adamyan's abilities to parent, the court ordered one year of individual mental health counseling for each parent to benefit themselves and their son. This is consistent with Dr. Brown's recommendation that both parents

> work with their individual therapists on ways to embrace their cultural backgrounds and how their cultural differences with each other and within the culture within which they presently reside might affect their co-parenting and the changing identity needs of a child born and raised of immigrant parents in the United States.[14]

---

[11] RCW 26.09.187(3)(a).

[12] RP (July 17, 2018) at 5.

[13] Ex. 35 at 10-11.

[14] RP (June 6, 2018) at 232 (quoting Ex. 21 at 29).

Similarly, the GAL recommended that both parents "seek individual mental health therapy for a period of one year."[15]

Mkrtchyan raised many concerns about Adamyan's ability to parent, but the court found any past issues "ha[ve] been resolved at this time" because M.M. "is getting good nutrition, love from everybody in this family, and [is] at this point thriving."[16] It also found that Adamyan "is working toward a new life" because she "has a new job, [is] renting a new apartment, has her own car, has better language skills, has been investigating daycares, [and] she not only supports speech therapy [for M.M.] but is actively expressing her opinions on who would be an appropriate therapist."[17] The court concluded Adamyan's past performance in the marriage was not reflective of her current state because she "has moved on from the person she once was when she moved here in 2014."[18]

The court accounted for M.M.'s daycare attendance and educational needs. The court considered both parents' work schedules in the parenting plan and revised the parenting plan after Adamyan's work schedule changed.

The court's written and oral rulings demonstrate that it considered each factor under RCW 26.09.187(3)(a).

---

[15] Ex. 32 at 39.
[16] CP at 19-20.
[17] CP at 21.
[18] CP at 21.

Despite this record, Mkrtchyan argues the court lacked sufficient information on Adamyan and should have ordered a third psychological evaluation of her because Dr. Brown opined she could have an undiagnosed personality disorder. But no expert believed a third evaluation would be helpful. Dr. Brown and Dr. Carson both rejected conducting additional evaluations at that time.[19] And the GAL's final report recommended individual therapy rather than additional testing. Only Mkrtchyan supported further delaying entry of a permanent parenting plan to conduct a third psychological evaluation. The court did not abuse its discretion or otherwise err by rejecting Mkrtchyan's request for additional testing.[20]

On this record, Mkrtchyan fails to show the court abused its broad discretion by entering a final parenting plan with equal residential time and shared decision-making authority.

---

[19] See RP (June 5, 2018) at 134 (Dr. Brown rejecting additional testing at the time); RP (June 7, 2018) at 508 (Dr. Carson testifying additional testing would not have been "prudent").

[20] To the extent Mkrtchyan suggests Dr. Brown's personality disorder theory compelled individual psychotherapy followed by additional testing of Adamyan, this argument rests on the credibility of Dr. Brown. But the trial court determined that Adamyan had resolved any parenting issues, implicitly rejecting any risk of future parenting issues. And credibility questions are left to the finder of fact. Burrill, 113 Wn. App. at 868. Given Dr. Carson's strong criticisms of Dr. Brown's conclusion on this topic, the court was free to give one expert's opinion greater weight than another's.

## II. Property Division

In a dissolution proceeding, the characterization of property presents a mixed question of law and fact.[21] As a legal question, we review de novo whether the property was properly characterized as community or separate.[22] We review factual questions, such as when the property was acquired and the parties' intentions, for substantial evidence.[23]

Mkrtchyan contends the court erred by concluding the couple's house was community property. He argues "the home was the husband's separate property because the trial court properly found that the husband used his separate property to fund the down payment."[24]

RCW 26.16.010 defines "separate property" as any "[p]roperty and pecuniary rights owned by a spouse before marriage and that acquired by him or her afterwards by gift, bequest, devise, descent, or inheritance, with the rents, issues and profits thereof." RCW 26.16.030 defines "community property" as any property, other than separate property, acquired after marriage. It is well settled in

---

[21] In re Marriage of Kile & Kendall, 186 Wn. App. 864, 876, 347 P.3d 894 (2015).

[22] Id.

[23] Id.

[24] Appellant's Br. at 41.

9

Washington that "the character of property as separate or community property is determined at the date of acquisition."[25]

Here, it is undisputed that Mkrtchyan and Adamyan acquired the house during their marriage.[26] Thus, we presume the house was community property,[27] and Mkrtchyan has the burden of rebutting that presumption.[28]

To establish that the house was his separate property, Mkrtchyan must provide clear and convincing evidence he acquired the house with his separate funds.[29] He relies heavily on the court's finding that his separate funds were used for the down payment on the house. He quotes In re Marriage of Chumbley for the proposition that "[p]roperty acquired during marriage has the same character as the funds used to purchase it."[30] But the Chumbley court was analyzing a stock purchase,[31] which is legally and substantively different than a purchase of real property acquired by a down payment combined with a loan secured by a

---

[25] In re Estate of Borghi, 167 Wn.2d 480, 483-84, 219 P.3d 932 (2009) (citing Harry M. Cross, The Community Property Law, 61 WASH. L. REV. 13, 39 (1986)).

[26] See RP (June 14, 2018) at 1187 (Mkrtchyan testifying that the house was purchased in September of 2015).

[27] Kile & Kendall, 186 Wn. App. at 876.

[28] See id. ("'The burden of rebutting this [community property] presumption is on the party challenging the asset's community property status and can only be overcome by clear and convincing proof that the transaction falls within the scope of a separate property exception.'") (internal quotation marks omitted) (quoting Dean v. Lehman, 143 Wn.2d 12, 19-20, 18 P.3d 523 (2001)).

[29] Schwarz v. Schwarz, 192 Wn. App. 180, 189, 368 P.3d 173 (2016).

[30] 150 Wn.2d 1, 5, 74 P.3d 129 (2003).

[31] Id. at 4-5.

mortgage.[32] The proposition from Chumbley is misapplied where, as here, the contested property was not truly "acquired" in a single cash payment.

Mkrtchyan and Adamyan used a mortgage to acquire a house during their marriage. Mkrtchyan does not challenge the finding that the mortgage was community debt, making it a verity on appeal.[33] And although Mkrtchyan notes he had separate property funds available to pay the mortgage, he fails to cite any evidence he actually used those funds to make mortgage payments. Under these facts, Mkrtchyan's use of his separate funds for a down payment does not rebut the presumption that the couple acquired the house as community property.

Mkrtchyan also relies on a quitclaim deed signed by Adamyan—purporting to deed her interest in the house to him—to rebut the community property presumption. But "the name on a deed or title does not determine the separate or community character of the property, or even provide much evidence."[34] The critical question is whether clear and convincing evidence shows the grantor spouse's intent to change the property from community to separate.[35] Because spousal intent is a question of fact, Mkrtchyan's argument is actually a challenge

---

[32] See State of Cal. v. Tax Comm'n of State, 55 Wn.2d 155, 158, 346 P.2d 1006 (1959) (shares of stock are personal property).

[33] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

[34] Borghi, 167 Wn.2d at 488.

[35] Id. at 484-85.

to the court's finding that Adamyan did not sign the quitclaim deed "of her own free will."[36]

We review findings of fact for substantial evidence.[37] Evidence is substantial when a sufficient quantity exists to persuade a fair-minded, rational person of its truth.[38] Substantial evidence supports a finding of fact even when contradicted by other evidence because credibility determinations are not subject to review.[39]

Substantial evidence supports the court's finding of fact. Adamyan testified she did not understand the quitclaim deed when she signed it. When they closed on the house, Adamyan had been living in the United States for approximately one year. She generally did not communicate in English at that time, even for a simple transaction like buying items in a store. According to Mkrtchyan, she was trying to get to the point of conducting such basic transactions in English. Adamyan and Mkrtchyan both testified that no one translated the quitclaim deed into Armenian or explained it to her in Armenian. As Adamyan explained, "[T]here were numerous documents displayed on the table. [Mkrtchyan] had told me that we were going there to sign the documentation for the newly purchased house. And I never

---

[36] CP at 12 (finding of fact 8).

[37] Kile & Kendall, 186 Wn. App. at 876.

[38] In re Marriage of Raskob, 183 Wn. App. 503, 510 n.7, 334 P.3d 30 (2014) (quoting Bering v. Share, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

[39] Burrill, 113 Wn. App. at 868.

asked him what was the meaning of . . . that paperwork because I trusted [him]."[40] Although Adamyan also testified she "didn't even doubt that [Mkrtchyan] could buy a house without [her]"[41] and Mkrtchyan testified that Adamyan said she did not care whether the house was separate property, this contradictory evidence does not unsettle the trial court's finding of fact.

Substantial evidence supports the trial court's factual determination that Adamyan did not intend to change the house into separate property when she signed the quitclaim deed. Because Mkrtchyan does not present clear and convincing evidence to rebut the presumption that the house was community property, the court did not err by classifying it as such.

III. Attorney Fees on Appeal

Adamyan requests attorney fees on appeal. RAP 18.1 authorizes an award of attorney fees where allowed by law. Under RCW 26.09.140, a party may be entitled to attorney fees on appeal. An award of attorney fees under RCW 26.09.140 includes consideration of "'the parties' relative ability to pay.'"[42]

---

[40] RP (June 20, 2018) at 1400-01. Adamyan testified through an Armenian interpreter.

[41] Id. at 1400.

[42] In re Marriage of Muhammad, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting In re Marriage of Leslie, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)).

Based on Mkrtchyan's substantially greater ability to pay,[43] we award Adamyan attorney fees from this appeal upon her compliance with RAP 18.1.

Therefore, we affirm.

WE CONCUR:

---

[43] Mkrtchyan failed to file a financial affidavit as required by RAP 18.1(c). The record before us reveals his monthly income is several times greater than Adamyan's.