**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>CHRISTOPHER ROBERT FINK,<br><br>              Appellant,<br><br>    and<br><br>BRIDGET LOUISE FINK,<br><br>              Respondent. | No. 85027-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Christopher Fink appeals the dissolution decree from his marriage to Bridget Fink.[1]  Christopher argues the trial court mischaracterized his house and Bridget's 401(k) account as community property, and abused its discretion in dividing the property equally given the short term of the marriage.  We affirm.

I

Christopher and Bridget met in 2007 or 2008 while they were both working at Boeing.  They began a romantic relationship in 2015 and in November 2015, Bridget and her child moved in with Christopher and his children.  They lived in a house in Lake Stevens, Washington (house), that Christopher bought in 2014.  Christopher's mother

---

[1] Because the parties share the same last name, we refer to the parties by their first names for clarity.  No disrespect is intended.

was a cosigner on the mortgage and on the title to the house. Christopher and Bridget married in July 2018.

Christopher and Bridget acknowledged that their financial resources sometimes did not cover all the expenses of the community. Both contributed funds to a joint checking account. At times, Bridget felt it was necessary to contribute from her separate funds to keep the family afloat. Bridget testified that before the marriage, and even while she was unemployed, she withdrew from her 401(k) account to cover community expenses. She also testified that although Christopher did not ask her to contribute, he knew she was doing so. Christopher confirmed that as early as February 2016, Bridget contributed to the mortgage payment on the house. Bridget withdrew about $70,000 from her 401(k) account until it was depleted. She believed $10,883 was deposited into the joint account to pay for joint expenses. Bridget incurred about $18,000 in IRS tax penalties for the 401(k) account withdrawals.

During the relationship there were times that Christopher was not working and there were times that Bridget was not working. When Bridget was not working, she cared for Christopher's minor children.

There was a fire at the house in 2020 that caused extensive damage requiring substantial repairs. Christopher testified that the house was taken "down to the studs" and completely refinished. Both parties participated in decisions over the remodel and facilitated the necessary work. Insurance paid for the repairs which totaled around $200,000. The result was a significantly different and improved house. Christopher testified that because the market went up the value of property nearly doubled to about $550,000.

Christopher testified that following the fire he sought to refinance the house and, in the process, also remove his mother from the title. Bridget testified it was always their goal as a couple to remove his mother from the title and to add Bridget. She stated that Christopher never said he intended for the property to remain his separate property. On the other hand, Christopher testified he did not intend to transmute the property to the community.

The parties both testified that the purpose of the refinance was to consolidate and pay off separate and community debt. Proceeds were used to pay off credit cards, a truck bought after their marriage, and the balance owing on Bridget's IRS tax debt. They received about $47,000 in cash of which $20,000 was given to Christopher's mother, and the remainder was deposited in their joint accounts. And as part of the refinance, Christopher executed a quitclaim deed conveying the house as his separate property to community property for himself and Bridget as husband and wife.

The marital community ended when the parties separated on February 14, 2022. Christopher petitioned for dissolution on June 14, 2022.

The trial court heard testimony from Christopher, Bridget, and Bridget's daughter. The trial court found the parties began a committed intimate relationship in November 2015. The court found that the parties and their children were a family unit even before the marriage and treated the property as a family home. The trial court found that during the relationship each party made significant sacrifices consistent with a couple who intended to stay together long term.

The court also determined that Christopher intended to transmute the house into community property and that Bridget intended to transmute the 401(k) into community

property. As for the house, the trial court gave several reasons for the conclusion that Bridget overcame the presumption of separate property by clear and convincing evidence.[2] First, while there was some evidence about why his mother wanted off the title to the home, Christopher could have accomplished that without adding Bridget on the title. As for the money contributed by Bridget to pay the mortgage, the trial court found it was unreasonable to believe Christopher did not know the money came from her separate funds or that, had she not contributed, he would have simply found the money. Instead, it was more reasonable that Christopher knew where the money came from and knew that Bridget was unhappy about it because money is such an important subject within a marriage and often the source of disputes. The trial court also found that Christopher, as a successful person earning $100,000 a year, was not so unsophisticated that he could not understand the purpose of the deed put before him as part of a refinance that he requested.

The trial court noted the marriage was short term but that it was impossible to return the parties to where they were financially before the relationship because too many changes occurred considering the fire, remodel, and the depletion of the 401(k). The trial court reasoned that awarding Bridget the pre-relationship value of the 401(k) would not account for any growth that might have occurred and would disregard that its contribution toward the mortgage helped retain an asset for the community. And sacrifices were made that cannot easily be given value such as when Bridget remained home and cared for Christopher's minor children. As a result, the trial court concluded

---

[2] The oral ruling was formally incorporated into the findings and conclusions and so it has binding effect. Ferree v. Doric Co., 62 Wn.2d 561, 567, 383 P.2d 900 (1963).

that to give effect to the intent of the parties that the marriage was supposed to last and that both sides were to contribute equally, the trial court ordered an equal division of the assets.

The trial court entered a final dissolution decree on January 26, 2023.

Christopher appeals.

II

Christopher first argues the trial court erred by characterizing the home and Bridget's 401(k) as community property. We disagree.

"In performing its obligation to make a just and equitable distribution of properties and liabilities in a marriage dissolution action, the trial court must characterize the property before it as either community or separate." In re Marriage of Kile, 186 Wn. App. 864, 875, 347 P.3d 894 (2015). Characterization of property is a mixed question of law and fact. In re Marriage of Watanabe, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). "Factual findings, including time of acquisition, method of acquisition, and intent of the donor, supporting the characterization are reviewed for substantial evidence." Watanabe, 199 Wn.2d at 348. Whether "a rebuttable presumption of community or separate character is overcome is a question of fact." In re Marriage of Schwarz, 192 Wn. App. 180, 192, 368 P.3d 173 (2016).

Evidence is substantial when it is "sufficient to persuade a fair-minded person of the truth of the matter asserted." In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). This court does not review the trial court's credibility determinations or weigh conflicting evidence. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d

1041 (2017). "The characterization of property is reviewed de novo as a question of law." Watanabe, 199 Wn.2d at 348-49.

Whether property is characterized as separate or community is determined at the time of acquisition. Schwarz, 192 Wn. App. at 189. In Washington, there is a presumption that all property acquired during marriage is community property. Watanabe, 199 Wn.2d at 351. But, if property is separate property at the time of acquisition, it remains separate property as long as it can be traced and identified. Watanabe, 199 Wn.2d at 351. "Once separate property is established, a presumption arises that such property remains separate property absent direct and positive evidence of intent to convert to community property." Watanabe, 199 Wn.2d at 351.

Christopher relies on In re Estate of Borghi, 167 Wn.2d 480, 219 P.3d 932 (2009) (plurality opinion) and Watanabe. He contends the trial court's factual findings are not supported by substantial evidence because the only evidence that he intended to transmute the home to community property was Bridget's self-serving testimony. We disagree.

In Borghi, the decedent, Jeannette, bought real property under a real estate contract before her marriage to Robert. After the couple were married, the seller of the property, Cedarview Development, executed a special warranty deed to Robert and Jeanette, as husband and wife. Borghi, 167 Wn.2d at 481-82. After Jeannette died, Robert brought a declaratory judgment action to resolve a dispute with Jeannette's son from a prior relationship over the characterization of the property. Borghi, 167 Wn.2d at 483. The court stated a spouse may, as evidence of his or her intent, execute a quitclaim deed transferring the property to the community. Borghi, 167 Wn.2d at 488-

89.[3] The court held that Cedarview Development's inclusion of Robert's name on the special warranty deed did not reveal whether Jeannette intended to transmute her separate property into community property. Borghi, 167 Wn.2d at 491. Because the focus is on the intent of the spouse who originally owned the separate property and there was no acknowledged writing evidencing Jeanette's intent, the deed was insufficient by itself to rebut the presumption of separate property. Borghi, 167 Wn.2d at 490-91.

In Watanabe, Pedersen inherited a 50 percent interest in a property later secured to finance the purchase of a second property. 199 Wn.2d at 345-46. Because Pedersen had no credit at the time, a condition to obtaining the loan was to add her husband Watanabe to the title of the secured property. Watanabe, 199 Wn.2d at 346. Pedersen quitclaimed her interest in the secured property to herself and Watanabe "to establish community property." Watanabe, 199 Wn.2d at 346. Pedersen did not recall signing the deed and claimed it was only done because the loan required it. Pedersen claimed the loan was intended to be short-term until the secured property could be sold and that she never intended to convert the property to community property.

The trial court determined that Pedersen did not intend to convert her separate interest in the secured property to the community. Watanabe, 199 Wn.2d at 346. Relying on Borghi, the Supreme Court determined that the facts presented supported the trial court's findings about the secured property and noted the evidence included: "the fact that the deed was drafted by the lender, Pedersen's testimony that she had no

---

[3] The assertion about the specific evidence required to overcome the presumption of separate property received approval from only a plurality of the Borghi court. See Watanabe, 199 Wn.2d at 349-50, n.3.

recollection of signing the deed and did not have anyone explain what signing would entail, and the loan company's requirement that Watanabe be added to the title."[4] Watanabe, 199 Wn.2d at 352, n.4. Because Pedersen had presented an alternative reason for including Watanabe on title—the loan required it—Watanabe failed to show Pederson intended to convert her separate property. Watanabe, 199 Wn.2d at 354.

Christopher obtained the home before the relationship so there is a presumption of separate property. Christopher argues that presumption was not overcome and he never intended to transmute the home to community property. But this case is distinguishable from both Borghi and Watanabe. Unlike in Borghi, Christopher—not a third party—executed a quitclaim deed transferring the home to the community and expressed his intention to do so in the deed itself. Consistent with Borghi, such a writing is evidence of intent. And unlike Watanabe, Christopher remembers signing the quitclaim deed and it is not clear from the record that the lender required Bridget to be on the title to the home in order to refinance the mortgage. The parties testified that the refinance was mutually desired to clear debts incurred separately and as a community and the remaining proceeds were deposited into a joint account.

The trial court also stated it did not rely solely on the deed. Nor did it rely solely on Bridget's testimony. Indeed, the trial court also considered Christopher's knowledge that the money to sometimes pay the mortgage came from Bridget and her resulting frustration or unhappiness reasonably spurred his motivation for wanting to add Bridget to the title. The trial court found Christopher's testimony that he did not know what

---

[4] The court relied on the trial court's findings of fact as verities because Watanabe failed to assign error to them on appeal. Watanabe, 199 Wn.2d at 349.

Bridget was doing to be unreasonable. We defer to the trial court's credibility determinations and weighing of conflicting evidence. Black, 188 Wn.2d at 127. Taken together and considering how the parties treated the house and committed to combining families in the house, the evidence was sufficient to overcome the presumption of separate property.

As to the 401(k), substantial evidence supports the trial court's finding that Bridget sacrificed her separate property for the benefit of the relationship.

For these reasons, the trial court's findings were supported by substantial evidence and from such evidence it follows that Christopher intended the house to be community property and Bridget intended the 401(k) to be community property. Thus, the trial court did not err in characterizing the house and the 401(k) as community property.

III

Christopher argues the trial court abused its discretion in dividing the property because the marriage was short term and the parties were not placed in a similar position to when they married. He also contends that because the house and the 401(k) were mischaracterized as community property, the division of property flows directly from untenable findings and reversal is required. We disagree.

In dividing property, the trial court must consider (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the division of the property is to become effective. RCW 26.09.080. "No factor is afforded

greater weight than any other." In re Marriage of Groves, 10 Wn. App. 2d 249, 255, 447 P.3d 643 (2019).

A trial court has broad discretion in distributing the marital property, and its decision will be reversed only if there is a manifest abuse of discretion. In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). A manifest abuse of discretion occurs when the discretion was exercised on untenable grounds. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). If the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred. Rockwell, 141 Wn. App. at 243. "This is a highly deferential standard, and '[t]he spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court.'" Groves, 10 Wn. App. 2d at 255 (quoting In re Marriage of Landry, 103 Wn.2d 807, 809, 699 P.2d 214 (1985)).

Christopher fails to meet that burden. First, as discussed above, the trial court properly characterized the house and the 401(k) as community property. Even if the property were mischaracterized, such an error is not dispositive given the directive in RCW 26.09.080 for a just and equitable disposition. Second, the duration of the marriage is only one factor to consider. The trial court acknowledged that this was a short-term marriage and then noted why it was not a typical one—the fire resulting in an improved house and the depletion of Bridget's 401(k).

The trial court determined it was impossible to put the parties back in their pre-relationship positions. It was undisputed that the house is significantly changed and the 401(k) is depleted. The trial court explained that simply awarding Bridget the value of

the 401(k) would discount its contribution to the community and it would not account for any growth that may have occurred had it been left intact. The parties acknowledged that there were times that money was tight and Bridget testified that she used money from the 401(k) to cover community expenses—including the mortgage—despite not wanting to. Christopher knew some money was coming from Bridget to support the community.

The parties both put money into joint accounts from which they paid community expenses. The proceeds from the refinance were used to pay community debts and a large amount of cash was deposited into a joint account. There were times during the relationship that Bridget worked while Christopher did not and there were times that Christopher worked while Bridget did not. Bridget cared for Christopher's minor children and they considered her a mother. Substantial evidence supports that the parties intended to create financial equality between them. The court therefore determined that awarding Bridget the value of the 401(k) only and awarding the house to Christopher was not an equitable solution.

Under these circumstances, the trial court did not abuse its discretion by dividing the community property equally. We affirm.

_____Mann, J._____

WE CONCUR:

_____Feldman, J._____          _____Hazelrigg, A.C.J_____

-11-