## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>ASHLEY BOATSMAN,<br><br>                Respondent,<br><br>    and<br><br>MATTHEW DUNCAN,<br><br>                Appellant. | No. 56869-1-II<br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — This appeal arises from a marriage dissolution action between Matthew Duncan and Ashley Boatsman. Duncan appeals the trial court's orders addressing the distribution of property and spousal support payments. Duncan argues that the trial court mischaracterized his military pension and other various personal property as community property. Duncan also argues that the trial court abused its discretion in awarding Boatsman 1/3 of his military pension because substantial evidence does not support the court's finding that he had the ability to pay such an award. Duncan further argues that the court abused its discretion in awarding spousal support payments at $1,000 per month for 48 months. Boatsman requests attorney fees and costs on appeal.

Even assuming without deciding that the trial court mischaracterized the various properties at issue, we hold that the trial court's characterization of the properties does not compel reversal. We hold that the trial court did not abuse its discretion in awarding Boatsman 1/3 of Duncan's military pension because substantial evidence supports that Duncan had the ability to pay. We hold that the trial court did not abuse its discretion in its spousal support award. We grant

Boatsman's request for attorney fees and costs because she had a need and Duncan has the ability to pay. However, we deny attorney fees under RAP 18.9 because Duncan's appeal is not frivolous. Accordingly, we affirm.

FACTS

I.      FACTUAL BACKGROUND

Boatsman and Duncan were married on February 2, 2006, in Las Vegas, Nevada. Duncan served in the United States Army from 1996 until his retirement in 2018. The parties did not live together in Washington at any time during their marriage. They lived in Tennessee from 2006 to 2010 and in Virginia from 2010 to 2018. The parties moved to Arkansas shortly after Duncan's retirement. None of these states are community property states.

However, after the parties moved to Arkansas, Duncan suffered a "massive stroke," which required hospitalization. Rep. of Proc. (RP) at 61. In May 2018, Duncan moved to Long Beach, Washington to receive care from his mother, Joyce Crawford. Crawford is Duncan's caregiver through the Department of Veteran's Affairs (VA). Boatsman decided to stay in Arkansas to look after her father because he was suffering from Alzheimer's at the time. The parties subsequently separated on May 15.

II.     THE TRIAL

On February 6, 2020, Boatsman filed a petition for divorce in Pacific County Superior Court. The case proceeded to a one-day bench trial on January 19, 2022. The court heard testimony from Boatsman, Duncan, Crawford, Chip Green (Duncan's friend), and Steven Duncan (Duncan's father).

A.     Boatsman's Testimony

Boatsman testified that she was a stay at home spouse throughout the duration of the marriage so that she could support Duncan's military career. She testified that she encouraged Duncan to "rank[] up" and she would help him study for his board exams because he had dyslexia.[1] RP at 76. She was also responsible for cooking, cleaning, and providing emotional support for Duncan. Boatsman testified that, during Duncan's deployments, she would consistently send him care packages because the food provided by the military would make him sick. Boatsman testified that her support allowed Duncan to rank up because he was always "kind of stagnant in his ranking. He didn't really mind if he ranked up or down." RP at 76.

Boatsman testified that she did not generally work during the marriage. When she did work, she took on short-term jobs such as delivering pizzas and selling life insurance. Boatsman testified that she "delivered pizzas for like six weeks" when they lived in Virginia. RP at 134. Boatsman testified that she sold life insurance for "about a year" when they lived in Tennessee. RP at 134.

Boatsman testified that she holds a master esthetician license, which she earned in 2015 while living in Virginia. Boatsman testified that she began working as an esthetician at a company called Faces after she and Duncan separated. However, because of COVID-19, Faces lacked sufficient business and she could not find any work. Her position at Faces did not provide health insurance. Thus, Boatsman took on a second job at a home healthcare company called Pinnacle. There, she works 35 hours per week at a payrate of $14 an hour with no benefits. Boatsman also

---

[1] Military rank is a badge of leadership. Responsibility for personnel grows with each advancement.

began a startup company in late 2021 called Easy Disposal, which helps people dispose of their junk. However, Easy Disposal has acquired "zero income." RP at 120.

Boatsman testified that she wished to start her career over. More specifically, Boatsman testified that she wanted to pursue a career in respiratory therapy, which requires a bachelor's degree. She testified that she would pursue the four-year degree at Arkansas Tech University as it is only 17 miles from her father's Arkansas home. According to Boatsman, she would be able to support herself as a respiratory therapist because they make roughly $40,000 to $50,000 per year.

Boatsman testified that her father passed away after she and Duncan separated. She testified that she would be inheriting her father's house after she paid her brothers $28,000 total. The total value of the house is $58,000. She also inherited about $50,000 from her father's retirement accounts. However, she no longer has the $50,000 because she spent the money on attorneys for the divorce proceedings.

Boatsman testified about her monthly expenses. She testified that she would be living in the Arkansas home while she went to school. She would be paying her brothers $400 in rent to stay there. For electricity, heating, gas, and oil, she estimated around $200 per month. For utilities, such as water, sewer, and garbage, she estimated $80 per month. For the telephone bill, she estimated around $160. For cable and internet, she estimated $100. For groceries, she estimated only $300. For household supplies, she estimated $100. For healthcare issuance premiums, she estimated $60 because she is still on Duncan's military insurance. However, that cost is set to increase to $700 if she is no longer on Duncan's insurance. For healthcare costs not covered by insurance, she estimated $75 per month because she takes prescription medication to treat her depression, anxiety, and high blood pressure. However, those costs are also set to increase if she

is no longer on Duncan's insurance. For transportation related costs, she estimated $375 per month. For personal care, she estimated about $150 per month. For other personal expenses, such as home maintenance, life insurance, and care for her two cats, she estimated about $200 per month.

Based on the above expenses, Boatsman requested the court to award her $1,500 per month in maintenance. She testified that she would work-part time while attending school for supplemental income.

Boatsman testified she had access to Duncan's bank accounts for a couple of months after they separated. She was removed from the accounts after Duncan's mother became his attorney-in-fact via a power of attorney. However, Duncan and his mother paid Boatsman approximately $980 per month for about 11 months from the retirement account following the separation. This $980 monthly amount represented about 50 percent of Duncan's monthly retirement payment (for a total of about $2,000 to $2,100).

Thus, Boatsman requested the court to award her 50 percent of Duncan's military pension. She wished to start a retirement account for herself because, by being a stay at home spouse, she had no retirement earnings. She also asked the court to award her 50 percent of the pension during the first 10 years Duncan was in the military, even though they were not married during this time. She reasoned,

> because I was with this man since I was 17 [years old]. We were legally married for a long time. And I have nothing. And I mean, he deserves what he's earned, and he deserves every bit of it. But I have to believe that—he always told me he—he would never leave me with nothing, that he wanted me to be okay.

RP at 143.

Boatsman also testified about various personal property. Boatsman testified about a 2006 Harley Davidson Fat Boy that she and Duncan acquired during the marriage while living in

Virginia. She testified that "we got it together. He wanted the motorcycle, and I wanted him to have it." RP at 116. She also testified that "I agreed we would buy [the Harley] if he would quit smoking because it scared me." RP at 79. As to its valuation, Boatsman testified that it was worth $12,000.

Boatsman testified about a small fishing boat that was acquired during marriage. She testified that "I'm not familiar with boats. It was a small boat that he had acquired because he likes to fish." RP at 72. Boatsman could not provide an approximate valuation of the fishing boat.

Boatsman testified about various firearms. She testified that Duncan "had tons of firearms" and that some firearms were acquired during the marriage, some were not, but that most of them were. RP at 72. She was not familiar with any of the firearms, but did provide testimony regarding a custom-made sniper rifle. She testified that it was worth $10,000 and that Duncan paid for it.

Boatsman testified that the above personal property was worth approximately $47,000. She did not wish to have those items returned. However, she did ask for half of the value to be awarded to her as a community property interest.

Boatsman also testified about her and Duncan's finances during the marriage. She testified that they maintained a joint bank account that "[Duncan's] paycheck got . . . disposed into." RP at 135. She also testified that they maintained two separate bank accounts. Boatsman testified that she would pay all the bills and move the money between accounts as needed. She also testified that they used to live paycheck to paycheck as Duncan made $42,000 per year, which equated to "less than [$4,000] a month." RP at 136.

B.    Duncan's Testimony

Duncan provided limited testimony due to the health complications resulting from his stroke.  He only briefly stated his first name and stated that he wanted a divorce.

C.    Crawford's Testimony

Crawford testified that she is Duncan's mother and caregiver through the VA.  She testified that the VA pays her $1,600 per month to act as Duncan's caregiver.

Crawford testified that she is Duncan's attorney-in-fact, which permits her to control his finances.  Duncan executed the power of attorney in October 2018.

Crawford provided testimony regarding Duncan's income streams.  She testified that Duncan receives about $1,500 per month in social security and $4,700 per month in disability payments through the VA.  The social security account is part of his disability payments.  Duncan also receives income though his retirement account, which totals about $2,100 per month as explained above.  This totals $8,300 per month.

Crawford testified that her $1,600 payment usually comes from either Duncan's social security or disability accounts.  This is Duncan's only living expense and the remaining funds ($6,700) constitute discretionary spending.

Crawford testified Duncan has about $18,000 in his social security account, which is part of his disability payment as explained above.  She testified that Duncan has roughly $52,000 in his VA disability account.  Crawford later testified that about an approximate $22,000 withdrawal had been transferred into an investment account.  However, that amount would be transferred back into his disability account.  Thus, his VA disability would actually have about $74,000 in total.  Crawford testified that Duncan's retirement account had roughly $4,000.

Crawford testified about some large withdrawals that have been coming out of Duncan's financial accounts. While she was able to confirm some of the withdrawals, such as lawyer fees, devices to help Duncan communicate, a dog, and Amazon purchases, she could not confirm many others even though she manages the accounts. In fact, she testified that "lately I haven't been taking [the $1,600] because [Duncan] had so many outrageous expenses. I've waived it." RP at 172-73.

D.     Green's Testimony

Green testified that he served in the military with Duncan and has known Duncan since 1998. Green provided testimony regarding Duncan's firearms, such their valuation and when Duncan acquired those firearms.

Green testified that Duncan owned a "light wood .22" rifle, which was given to Duncan by his father. RP at 213. Green testified that Duncan owned a dark wood "300 Win Mag," which was a hunting rifle also given to him from his father prior to entering the military. RP at 214. Green testified Duncan owned a "Mini-14," but was not familiar with it or where it was obtained. RP 214-15. Green testified that Duncan owned an "AR-15," which he purchased in 2010 and was valued at about $1,000. RP at 215. Green testified that Duncan owned a "Glock 45" and that he obtained it prior to 2006. RP at 216. Green testified that Duncan owned a "30-06 or a 30-30 Red Ranch," which was given to Duncan by his uncle. RP at 217. Green testified that Duncan owned another .22 rifle, but was unclear where or when he acquired it. Green testified about a BB gun, but also could not testify to where it came from or how much it was worth. Green testified about a "410 shotgun," which Duncan obtained prior to entering the military. RP at 217. Green testified about another firearm, but was unsure about the make, model, or its origin.

E.      Duncan's Father

Duncan's father provided testimony regarding the firearms, such as their valuation and origin.  Like Green, Duncan's father testified that he gave some firearms to his son, such as a red .22 Marlin rifle, another .22 rifle, and a hunting rifle that was either a Remington or 300 Winchester Magnum.  He did not recall giving Duncan a Glock (pistol) when he graduated high school, but noted that it would be worth $500.

III.    TRIAL COURT'S ORDERS

On March 24, the trial court entered a military retired pay division order.  This order awarded Boatsman 33.3 percent of Duncan's disposable military retired pay.

On the same date, the trial court entered findings of fact and conclusions of law.  The court found that neither spouse owned community real property, but that Boatsman has a separate property interest in real estate in Arkansas.  The court found that the personal property listed in Exhibit A was the spouses' community property.  Exhibit A provides:

> 1) Military retirement from Respondent's service of 33.3 percent to Petitioner from May 2018 to the [sic] February 2022, less the amount of $10,857 which was paid by Respondent to Petitioner during that time period and subject to other offsets:

| 2) Personal Property including: | Value |
|---|---|
| Firearms | $2,500 |
| Boat | $1,000 |
| Nissan Maxima | |
| Chevrolet S10 | |
| Harley Davidson Motorcycle | $6,000 |

> 3) All property currently in her possession.

CP at 211.  The court concluded that "[t]he division of community personal property described in the final order is fair (just and equitable)."  CP at 207.  The court found that the personal property listed in Exhibit B is Duncan's separate personal property.  Exhibit B provides that "Military

9

retirement accrued from date of entering service," "Miscellaneous firearms purchased or given as gifts to Respondent," "Motorcycle," and "Boat" were Duncan's separate property. CP at 212. Likewise, the court concluded that "[t]he division of separate personal property described in the final order is fair (just and equitable). CP at 208.

The court's written findings do not mention how the court arrived at its characterization of the personal property at issue. The oral findings provide no guidance either:

> THE COURT: All right. All right. At the outset, the Court finds it has jurisdiction over the parties and the marriage. It finds the marriage occurred on February 2, 2006. It gives a separation date, I'm going to say May 1st of 2018. There was a differing amount of testimony about when the actual separation occurred, so the Court's going to set it at May 1, 2018.
>
> Any and all property acquired after that date will be the separate property of the parties. Any and all debt acquired after that date will be the separate debt of the [parties] and is awarded to them accordingly.
>
> Let's start out with property, personal property. There is testimony about some guns, a motorcycle, two vehicles, a boat, I believe is really the sum total of the personal property, and some miscellaneous items, clothing and that of both parties.
>
> As to the guns, at least some of the guns were acquired through gifts to the husband prior to any marriage. Some were not. Based on the testimony, Court's going to set value of the guns, $2500 for the guns that were acquired during the marriage. And that's looking at the guns that have been testified to and the value of. So $2500 for the guns that will be awarded in an offset to the wife, one-half of that as her separate—excuse me, as community property interest in the guns.
>
> As to her car, I believe it was a Maxima she testified that she had during the marriage. That will be awarded to her. There was a Jimmy or a GMC or small SUV that was testified to that the husband had. That will be awarded to him. Those were both community property assets but awarded as the Court's already indicated.
>
> That leads us now to a motorcycle. And it was purchased by the husband's mother, she claims for around $8000. The wife says the original purchase price was somewhere close to 12,000. Depreciation of the motorcycle of that number of the years, 8000 would be the value the Court sets. The mother testified there was a $2000 debt that was on the motorcycle leaving a balance of $6000 in equity. That will be split between the parties as a community asset, 50/50.
>
> As to the other sundry items that were mentioned in bins and bags of clothes, the Court is going to say that's set off for both the parties in as far as their personal clothing and other items.
>
> There's a boat that was testified to. No value has been given to the boat, only a very brief description of the boat was given. Court is going to set the value

of the boat at $1000 and will award each party 50 percent community interest in that boat.

We turn next to the pension. This was a long-term marriage. At the outset, as far as what law is going to apply in this case, the Court sees in no way Arkansas law would apply. Any relationship to that state seems to be tenuous at best. They were only there for a couple of weeks, it sounds like as—in the marriage, such as it was. And then for some reason, both individuals find themselves in the state of Washington in front of this Court, so Washington law will apply.

As far as the *Landry* case and how the pension under *Landry*, since it was separate property state that the majority of the marriage was in, if it's not community property, the Court is going to find it community property-like at this point and will divide the pension as follows.

It appears, to the testimony, that there was approximate 10 years of service prior to the marriage which the pension accrued and approximately another 10 years or so after marriage. However, the more valuable years of that pension accruing would have been in the later years. So instead of just doing a 25 percent interest in the pension, the Court is going to award a one-third interest in the pension. So that's what, 33.3 percent to the wife.

. . . .

THE COURT: Now we have testimony that there was some 11 months after date of separation that were paid through the pension, but then no payments whatsoever for the last 25 or so months. The Court is going to award arrearages for the last 25 months at that same 33.3 percent rate.

RP at 268-72.

The court also concluded that spousal support payments should be ordered. The written findings of fact and conclusions of law provide that,

**Conclusion:** Spousal support should be ordered because:

1) Need. Petitioner is 41-years old, unemployed, and in need of vocational training to become self-sufficient after the divorce.
2) Ability to Pay: The court finds that Respondent, Matthew Duncan, since separation, has accrued the sum of approximately $90,000, which is held in accounts that he has access to and an ability to pay maintenance to the Petitioner.

CP at 208. The court's oral findings provide further guidance on the issue of spousal support:

[THE COURT:] The next issue is the maintenance. What we have is one party who has, for whatever reason, not worked during the marriage, and that seems to be by agreement. There was no testimony that that was ever an issue or something that was done at the behest of one of the parties against the wishes or will of the other party. And what we have is one party who, by the testimony here,

11

seems to have substantial liquid assets. And my calculations I think was around 90,000, 80- to $90,000 sitting in bank accounts.

Now, some of that is disability, and of course, that is rightly his and is not to be considered or separated—excuse me—not to be considered or divvied up by the Court. A military disability, to my recollection of the law, is not to be divvied up by the Court.

However, what's disturbing to the Court is that all the monies and all the— the asset that's been depleted was the retirement account. And money is funded and fungible. And if all the living expenses and everything is getting paid out of the other accounts and we weren't touching the disability account, then what we have is really an over dilution of the accounts that are available for the Court.

So that's not something that the Court has not taken note of. And the Court is allowed to look at the relative positions of both parties regardless of whether or not it can divvy up the actual asset. We have someone here who is making minimum wage, has a plan for somewhat to hopefully make more than minimum wage.

Maintenance would be appropriate in this case based on the length of the marriage and the ability to pay and the need of the other party. Now that does not mean, however, that the wife is not going to be responsible going forward for her own expenses and things as well. And she is working. I'm taking that into account. The Court is awarding $1000 a month for maintenance, and that will be for the period of the 48 months to accomplish hopefully some remedial training or equitable training to have a better chance of supporting yourself in the future.

CP at 273-74.

The court then entered a final divorce order. Relevant here, the court entered a money judgment award against Duncan for a total of $23,638.42. The final order provides,

The judgment herein is based on back retirement owing to Ashley Boatsman in the sum of $30,595.42 (calculated monthly since separation through February 2022) plus $4,750 as a property equalization, less the sum of $10,857 of military retirement paid during the pendency of this case, less $850 which remains owing for terms assessed against Ashley Boatsman for a total of $23,638.42. Judgment shall be payable at $1,000 per month until paid.

CP at 214. The court awarded the personal property listed in Exhibit C to Boatsman as her separate property. CP 215. Exhibit C provides,

1) A judgment in the total sum of $29,907.10 as net repayment for military retirement and for property equalization;
2) The Nissan Maxima;
3) Any other property currently in Petitioner's possession; and

4) 33.3% of Respondent's retirement earned while in the army. A separate Order dividing the military pension shall be signed by the Court on a form approved by the Department of Defense.

CP at 218. The court awarded the personal property listed in Exhibit D to Duncan has his separate property. Exhibit D provides,

1) Harley Davidson;
2) All firearms in his possession;
3) A fishing boat;
4) Chevrolet S10;
5) All interest in the military retirement accrued while in the army less any amounts awarded to the Petitioner.

CP at 219. The court ordered Duncan to pay spousal support to Boatsman in the amount of $1,000 per month for a period of 48 months: from March 2022 to February 2026. Duncan appeals.

ANALYSIS

I.    CHARACTERIZATION OF PROPERTY

Duncan argues that the trial court erred in characterizing his military pension and other personal property (such as the motorcycle, boat, and firearms) because those assets were acquired outside of Washington in separate property states. He relies on *In re Marriage of Landry*, 103 Wn.2d 807, 699 P.2d 214 (1985), for the contention that the personal property at issue should have been classified as separate property. Even assuming without deciding that the trial court mischaracterized the various properties at issue, we hold that the trial court's characterization of property does not compel reversal.

A.    Standard of Review

"In a dissolution action, all property, both community and separate, is before the court for distribution." *In re Marriage of Schwarz*, 192 Wn. App. 180, 188, 368 P.3d 173 (2016). The trial court has broad discretion in dissolution proceedings "to make a just and equitable distribution of property based on the factors enumerated in RCW 26.09.080." *In re Marriage of Wright*, 179 Wn.

13

App. 257, 261, 319 P.3d 45 (2013). Thus, the trial court's decision will be reversed only if there is a "manifest abuse of discretion." *In re Marriage of Rockwell*, 141 Wn. App. 235, 243, 170 P.3d 572 (2007). A trial court abuses its discretion when its decision is based on untenable reasons or grounds. *Id.* A trial court's decision is also manifestly unreasonable "if it is outside the range of acceptable choices, given the facts and the applicable legal standard." *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

"A trial court's characterization of property as separate or community presents a mixed question of law and fact." *Schwarz*, 192 Wn. App. at 191-92. "'The time of acquisition, the method of acquisition, and the intent of the donor'" are questions left to the trier of fact. *Id*. at 192 (quoting *In re Marriage of Kile*, 186 Wn. App. 864, 876, 347 P.3d 894 (2015)). Whether the rebuttable presumption of community or separate character of the property is overcome also is a question of fact. *Id*. at 192.

We review the factual findings supporting the trial court's characterization of the property for substantial evidence. *Id.* However, the ultimate characterization of the property as community or separate is a question of law we review de novo. *Id*.

B.     Legal Principles

"In performing its obligation to make a just and equitable distribution of properties and liabilities in a marriage dissolution action, the trial court must characterize the property before it as either community or separate." *Kile*, 186 Wn. App. at 875. "Washington accepts the principle that the character of property is determined under the law of the state in which the couple is domiciled at the time of its acquisition." *In re Marriage of Smith*, 158 Wn. App. 248, 259, 241 P.3d 449 (2010). "'Separate property retains its separate character when it is brought into

14

Washington, unless it is commingled with community property.'" *Id.* (quoting *Landry*, 103 Wn.2d at 810).

"The trial court's characterization, however, is not controlling." *In re Marriage of Groves*, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019). "The trial court's primary goal is to ensure a fair and equitable distribution and, even if it mischaracterizes the property, the allocation will be upheld as long as it is fair and equitable." *Smith*, 158 Wn. App. at 259. "The trial court is in the best position to decide issues of fairness." *In re Marriage of Larson*, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). "'Under appropriate circumstances . . . [the trial court] need not award separate property to its owner.'" *Larson*, 178 Wn. App. at 138 (quoting *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001)).

However, "we will remand the matter for further consideration when '(1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way.'" *Schwarz*, 192 Wn. App. at 192 (quoting *In re Marriage of Shannon*, 55 Wn. App. 137, 142, 777 P.2d 8 (1989)).

C.      Any Alleged Mischaracterization Does Not Compel Reversal

Here, the trial court concluded that Washington law would apply and declined to apply the law of the domicile where the pension accrued and where the other personal property was acquired. This is incorrect. *See Smith*, 158 Wn. App. at 259. The court then found that 1/3 of the pension, firearms acquired during the marriage (even though much were given to Duncan via gift), boat, and motorcycle were classified as community property. The court did so without any specific findings of fact—written or oral—to support its characterization of the properties. Arguably, the pension, boat, and motorcycle could be correctly characterized as community property because the

spouses had maintained a joint bank account that Duncan's paychecks were deposited into. But what is troubling is the characterization of the firearms, as much of them (with the exception of a couple of firearms such as the AR-15 and BB gun) were gifts to Duncan. Without findings of fact, we are unable to determine the precise facts the court relied on in arriving at its characterization of the aforementioned properties.

But even assuming without deciding that trial court erred in characterizing 1/3 of the military pension, firearms, boat, and motorcycle as community property, this alone does not compel reversal. As discussed above, the trial court is not required to award property to an individual spouse based on the property's classification. *Larson*, 178 Wn. App. at 138.

Based on the facts of this case, reversal is not necessary because nothing in the trial court's oral ruling indicates that its division was significantly influenced by the characterization of the properties. Additionally, it appears to be clear that the court would have divided the property in the same way, regardless of characterization, because the record shows that the court's division of property was dictated by considerations of fairness and equity. In fact, the court's discussion of the military pension shows that the property division would have been the same regardless of characterization. *See* RP at 270-71 ("As far as the *Landry* case . . . , since it was [a] separate property state that the majority of the marriage was in, if it's not community property, the Court is going to find it community property-like at this point and will divide the pension as follows . . . 33.3 percent to the wife.").

Because the record shows that the trial court divided the property based on fairness and equity rather than the characterization of the property, and it is clear that the trial court would have divided the property in the same way, regardless of characterization, we hold that reversal is not required.

16

Relying on *Landry*, 103 Wn.2d 807, Duncan argues that the personal property should have been classified as separate property, which is "not subject to division in a Washington dissolution proceeding." Br. of Appellant at 24. We disagree because *Landry* held no such thing. Rather, the Supreme Court recognized that trial courts do have the statutory authority to award a spouse's separate property to the former spouse. *Landry*, 103 Wn.2d at 811-12 (discussing *In re Marriage of Konzen*, 103 Wn.2d 470, 477-78, 693 P.2d 97 (1985), which held that the trial court did not abuse its discretion in awarding a portion of petitioner's separate property, 30 percent of his military retired pay, to his former spouse). Additionally, cases following the *Landry* decision similarly recognize that courts need not award separate property to its owner in a dissolution action, as explained above. *Larson*, 178 Wn. App. at 138. Accordingly, this argument fails.

## II. ABILITY TO PAY

Duncan argues that substantial evidence does not support the trial court's finding that he had the ability to pay Boatsman the money judgment order, which represented arrearages in the pension payments. We disagree.

As explained above, the trial court has broad discretion in dissolution proceedings "to make a just and equitable distribution of property based on the factors enumerated in RCW 26.09.080." *Wright*, 179 Wn. App. at 261. When trial court findings are challenged, we review those findings for substantial evidence, which exists "'if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011) (quoting *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

17

As an initial matter, Duncan's argument appears to confuse the money judgment order and the spousal support order as one in the same. They are not. The court orders show that the money judgment order and spousal support order are different awards because the money judgment order represents arrearages in pension payments owed to Boatsman. Because Duncan argues that we should vacate the trial court's "money judgment order of $23,638.42," Br. of Appellant at 18, we will address whether the substantial evidence supports its finding that Duncan had the ability to pay that particular award.

Here, contrary to Duncan's contention, the court did not make an *explicit* finding as to his ability to pay the money judgment award. It, however, arguably made an *implicit* finding of Duncan's ability to pay by ordering that the money judgment "shall be payable at $1,000 per month until paid." CP at 214. We conclude that substantial evidence supports this finding because Duncan had already been paying Boatsman approximately $980 per month for 11 months following the separation from the retirement account. Additionally, substantial evidence supports his ability to pay because the record shows that all of the spending that occurs from the retirement account constituted discretionary spending not related to Duncan's living costs, which are low ($1,600 per month) and taken from Duncan's other financial accounts. Accordingly, this argument fails.[2]

---

[2] In arguing that substantial evidence does not support his ability to pay the money judgment order, Duncan argues that "the trial court erred when finding that [he] has $80,000-$90,000 in his bank accounts because that includes his $70,000 disability money which is solely for [him]." Br. of Appellant at 17. He cites *Perkins v. Perkins*, 107 Wn. App. 313, 26 P.3d 989 (2001), for the proposition that trial courts may not divide or distribute military disability pay in a divorce proceeding. However, the challenged trial court finding addresses the *spousal support order*, not the *money judgment order*. Thus, we will address this argument with Duncan's challenge to spousal support order below.

III.    MAINTENANCE AWARD

Duncan argues that the trial court abused its discretion in awarding Boatsman spousal support at $1,000 per month for a period of 48 months.  We disagree.

A.    Legal Principles

We review an award of maintenance for abuse of discretion.  *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 563, 446 P.3d 635 (2019).  The trial court has broad discretion to award maintenance.  *Id.*  "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Id.*

 "Maintenance is 'a flexible tool' for equalizing the parties' standards of living for an 'appropriate period of time.'"  *Wright*, 179 Wn. App. at 269 (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984)).  "Ultimately, the court's main concern must be the parties' economic situations postdissolution."  *Anthony*, 9 Wn. App. 2d at 564.

RCW 26.09.090 controls the award of maintenance.  RCW 26.09.090(1) provides a nonexclusive list of factors that the trial court must consider on the issue of maintenance:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . . ;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

Although the trial court must consider the factors listed in RCW 26.09.090(1), it does not need to make specific factual findings on all of the factors.  *Anthony*, 9 Wn. App. 2d at 564.

Maintenance not based on a fair consideration of the statutory factors constitutes an abuse of discretion. *Id*. "'The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just.'" *Id*. (quoting *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990)).

B.      The Trial Court Did Not Abuse Its Discretion

Here, although the trial court did not make specific factual findings, the record shows that the court considered all of the factors in RCW 26.09.090(1) when it set Boatsman's spousal support award. In setting the award, the court considered the financial resources of Boatsman, noting that she would be working part-time at either Faces or Pinnacle while attending school and that the latter only pays $14 per hour with no benefits. The court also considered the time necessary for Boatsman to acquire her bachelor's degree to become a respiratory therapist in order to support herself, which is four years. The court also implicitly considered the standard of living in setting the amount at $1,000 because there was testimony that she and Duncan typically lived on approximately $4,000 per month. The court also considered the length of the marriage, which was 12 years. The court also considered that Boatsman was 41 years old and in need of vocational training to become self-sufficient. The court also presumably considered Boatsman's monthly expenses in recognizing her need, as there was considerable testimony to that affect. And finally, the court considered Duncan's ability to pay noting that he had "80- to $90,000 sitting in bank accounts." RP at 273. The court also factored in Duncan's ability to meet his own needs, noting that his living expenses were low and taken from his disability accounts.

Because the record shows that the trial court considered all of the factors under RCW 26.09.090(1), and because the trial court has broad discretion in fashioning spousal maintenance awards, we hold that the trial court did not abuse its discretion in its award of maintenance.

20

Duncan argues that substantial evidence does not support that he has the ability to pay spousal support because the "$80,000-$90,000 in his bank accounts . . . includes his $70,000 disability money which is solely for [him]." Br. of Appellant at 17. He cites *Perkins v. Perkins*, 107 Wn. App. 313, 26 P.3d 989 (2001), for the proposition that trial courts may not divide or distribute military disability pay in a spousal support award. We disagree.

Here, Duncan's argument fails because the trial court did not award spousal support from Duncan's disability accounts. Rather, it awarded spousal support from Duncan's retirement account, noting that he had the ability to pay because all of the money from the retirement account had been depleted without much explanation. Instead, the court considered Duncan's disability pay as future income for Duncan to meet his own needs in awarding spousal support, which is proper under *In re Marriage of Kraft*, 119 Wn.2d 438, 447-48, 832 P.2d 871 (1992). And these accounts have over $90,000 in them, which the court correctly found. Accordingly, this argument fails.

Duncan argues that the court abused its discretion in setting the maintenance award because Boatsman already has a General Educational Development (GED) and an esthetician's license to provide for herself. He also contends that the court abused its discretion because Boatsman is currently working a full time job. We disagree because this argument ignores Boatsman's testimony that she is unable to find work as an esthetician. Additionally, while Boatsman does work full time at Pinnacle, the position only pays $14 an hour *with no benefits*. This is nowhere near the standard of living she enjoyed during her marriage with Duncan because she received considerable benefits from the military. Accordingly, this argument fails.

21

Duncan argues that the court abused its discretion in setting the maintenance award because his retirement account does not have large sums of money, which shows he lacks the ability to pay. We disagree because this argument ignores the total available funds to Duncan to meet his needs from his social security and disability accounts, which can be considered in setting maintenance as explained above. *See Kraft*, 119 Wn.2d at 447-48. Again, his living expenses are deducted from the disability accounts and all of his discretionary spending comes from his retirement. And his retirement provides $2,000 to $2,100 in monthly payments, which shows that he *does* have the ability to pay. Accordingly, this argument fails.

Duncan argues that the court abused its discretion in setting maintenance because Boatsman testified to living paycheck to paycheck with Duncan, which "should cast doubt on [his] ability to support both himself and [] Boatsman at the amounts ordered." Br. of Appellant at 21. While Boatsman did testify to living paycheck to paycheck during the marriage, we disagree with Duncan because his argument ignores the financial resources that he now enjoys from his retirement, disability, and social security accounts. Additionally, Duncan's argument fails because he ignores the low cost of living ($1,600 per month) he has while receiving care from Crawford, which again, comes out of his disability accounts—not his retirement. Thus, substantial evidence supports that Duncan has the ability to pay and meet his needs.

Duncan argues that the court abused its discretion because Boatsman had received valuable community property and an inheritance from her father, which included a home to live in and nearly $50,000 in cash. We disagree.

Here, Duncan's argument fails because the amount of community property awarded only totaled $4,750, which went toward the final money judgment order. Additionally, while Boatsman does have an interest in the Arkansas house, she will not inherit the house until she pays her

22

brothers $28,000 for it. In fact, the record shows that she must pay her brothers $400 per month in rent while living there. Furthermore, Boatsman did inherit nearly $50,000 from her father's retirement accounts, but she no longer has the funds because she spent it on attorneys in Arkansas and Washington for the divorce proceedings. Thus, the court did not abuse its discretion in determining that spousal support would be appropriate in this case.

Duncan also argues that the court abused its discretion because it "looked too far into the future when awarding 48 months of spousal support." Br. of Appellant at 21. We disagree because Duncan's argument ignores that the court awarded 48 months of spousal support for the purpose of Boatsman earning her bachelor's degree, which is a four-year degree.

In reply, Duncan also appears to argue that he lacks the ability to pay because he already has to pay Boatsman $1,000 in pension arrearages in addition to spousal maintenance, which is also $1,000 per month. We disagree because, again, all of the pay from the retirement account is Duncan's discretionary spending and he is able to meet his low living expenses from his well-funded disability accounts.

Accordingly, we hold that the trial court did not abuse its discretion in setting the maintenance award at $1,000 per month for a period of 48 months.

IV.    ATTORNEY FEES ON APPEAL

A.    RAP 18.1 and RCW 26.09.140

Boatsman requests attorney fees and costs on appeal under RAP 18.1 and RCW 26.09.140. We grant her request.

RAP 18.1(a) provides that we may grant attorney fees "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court." RCW 26.09.140 provides that the appellate court may order one

party to pay reasonable attorney fees and costs related to the dissolution litigation to the other party "after considering the financial resources of both parties." In considering the financial resources of both parties, we must "'balance[ ] the needs of the spouse seeking fees against the ability of the other spouse to pay.'" *In re Marriage of Urbana*, 147 Wn. App. 1, 16, 195 P.3d 959 (2008) (quoting *In re Marriage of Moody*, 137 Wn.2d 979, 994, 976 P.2d 1240 (1999)).

RAP 18.1(c) provides that,

> In any action where applicable law mandates consideration of the financial resources of one or more parties regarding an award of attorney fees and expenses, each party must serve upon the other and file a financial affidavit no later than 10 days prior to the date the case is set for oral argument or consideration on the merits.

"An appellate court will not consider an award of attorney fees on appeal under RAP 18.1 and RCW 26.09.140 when a party seeking fees fails to comply with RAP 18.1(c)." *In re Marriage of Crosetto*, 82 Wn. App. 545, 565-66, 918 P.2d 954 (1996).

Here, as of 10 days before this case was set for consideration on the merits, Boatsman has submitted an affidavit of financial need as required by RAP 18.1(c). Boatsman's financial affidavit shows that she has a need given her monthly income and expenses. And as discussed above, Duncan has an ability to pay given his monthly income. Accordingly, we grant Boatsman's request for attorney fees and costs on appeal.

B.      RAP 18.9

Boatsman also requests attorney fees and costs on appeal pursuant to RAP 18.9(a) because she contends that Duncan's appeal was meritless and therefore frivolous. We disagree.

Under RAP 18.9(a), we may order a party who uses the rules for the purpose of delay, files a frivolous appeal, or fails to comply with the rules to pay terms to any party who has been harmed by the delay or the failure to comply. "An appeal is frivolous when the appeal presents no

debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012).

Here, Duncan's arguments on appeal were not so lacking in merit that there is no possibility of reversal. Accordingly, we deny Boatsman's request for attorney fees and costs incurred on appeal under RAP 18.9(a).

CONCLUSION

We affirm the trial court's property distribution order and spousal maintenance order. We grant Boatsman's request for attorney fees on appeal under RAP 18.1 and RCW 26.09.140.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, J.

Cruser, A.C.J.