# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 57782-8-II |
| MARY BETH FLEMING, | |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| JOSHUA FLEMING, | |
| Respondent. | |

PRICE, J. — Mary Fleming and Joshua Fleming divorced. Following their dissolution trial, the trial court made certain decisions on parenting plans for their children and distribution of assets.

Mary appeals.[1] She argues that the trial court failed to issue the required findings of fact and conclusions of law for the parenting plans. Mary also argues that the trial court erred in distributing their house to Joshua, as separate property, for three reasons: (1) the house was built while Mary and Joshua were in a committed intimate relationship, (2) the house either was initially or eventually became community property, and (3) the distribution of the house to Joshua was not just and equitable.

We affirm the trial court's determinations that the house was Joshua's separate property. But we remand to the trial court to enter more detailed findings of fact and conclusions of law

---

[1] Because Mary and Joshua Fleming have the same last name, we refer to them by their first names. We intend no disrespect.

related to its parenting plans and distribution of property. The trial court may revisit the property distribution as necessary in light of this opinion.

FACTS

I.  BACKGROUND

Mary and Joshua began dating around 2001. But the relationship was not consistent; Joshua and Mary sometimes lived together, but they also broke up and lived separately multiple times in the first several years of their relationship. This pattern continued into 2005 and 2006, including after their first child, J.W.F., was born in 2005.

In 2006, Joshua purchased a plot of land from his parents and was the only person named on the deed. Joshua then obtained a construction loan to build a 1,600 square-foot house on the property. At that time, Joshua and Mary were separated and living apart; Mary had an apartment and Joshua lived with his mother. Like the deed, Joshua was the only person listed on the construction loan.

Mary and Joshua rekindled their relationship after the loan was obtained but before the house was completed. When they were back together at that point, Mary and Joshua sometimes lived in an apartment and sometimes with a family friend. Both maintained separate bank accounts, but they jointly contributed to expenses like bills, rent, and groceries. During that period of construction, Joshua paid for the construction loan payments on his own.

By the time the house was finished, about one to two years later, Mary and Joshua were back together and moved into the finished house with J.W.F. But soon Joshua and Mary separated again, and Mary moved out for some time. Later, they reconciled and Mary moved back in.

Eventually, Mary also contributed to the "house payment[s]." Verbatim Rep. of Proc. (VRP) at 271.

In 2009, Joshua refinanced the house for a lower rate because he was unemployed and could not maintain the payments. He no longer qualified for the loan amount alone, so Mary was included so her income and credit could be included in the refinance application. This resulted in Mary being added to the deed to the house.

Mary and Joshua eventually married in 2010, about four years after Joshua originally purchased the land. Thereafter, the couple maintained, for the first time, mutual bank accounts. They also paid for the mortgage with community funds. That same year, the house was refinanced again and Mary was again included on the loan and deed, but with her married name, "Fleming." Over the years, the couple refinanced the house several more times, including once in 2013 and twice in 2019, and Mary was on the loan and deed each time.

The couple would eventually have a total of three children together: J.W.F. (born in 2005), A.B.F. (born in 2010), and J.P.F. (born in 2016). After their third child was born, Mary contends the family began to outgrow the house. Thus, they remodeled the house and added an 800 square-foot addition around late 2019. One of the refinancings was apparently to finance the house addition.

In 2021, about 11 years after marrying, the couple separated and filed for divorce.

II. EVIDENCE PRESENTED AT DISSOLUTION TRIAL

The dissolution proceeded to a three-day bench trial in November 2022 to resolve matters of child custody and property distribution. Mary, Joshua, and Joshua's mother all testified

consistent with the facts above. The trial testimony also included details about Mary's and Joshua's relationships with their children and the couple's debts and assets.

Mary and Joshua both testified about payment of their bills and of the house's mortgage after they were married, the various refinancings, and the addition built onto the original house. Joshua said that after the couple married in 2010, both their incomes went to paying for bills and the mortgage and that Mary was included on all documents for all of the refinancings. Joshua explained that the addition to the house was 800 square feet and added a bedroom, a bathroom, and extended the kitchen. Mary testified that the couple had incurred "a lot of debt due to the home addition and the refinance of the home" and there was "a lot of debt that was incurred for adding on to the house." VRP at 221.

Mary and Joshua's assets primarily consisted of the house and several vehicles, and their debts included the most recent mortgage from refinancing the house, a vehicle loan, credit cards, and personal loans. Mary testified that she mainly used one vehicle, a Chevrolet Tahoe. The couple also provided some testimony about the values of their debts and assets.[2]

III. TRIAL COURT'S RULING AND SUBSEQUENT ORDERS

At the conclusion of the trial, the trial court orally explained its final decisions on the parenting plans and asset distribution. First, the trial court explained that Mary would have

---

[2] The testimony at trial indicated that the Tahoe was worth about $36,000 and there was about $40,000 in loan debt on the Tahoe. The house was worth about $659,000 and the outstanding debt on the mortgage was about $359,000, but the exact amount owed on the mortgage was unclear. There was also testimony that estimated the couple's unsecured debt between $56,000 and $60,000. Other sources in our record indicate the unsecured personal debt to be nearly $72,000. It is possible that additional information about the value of assets, like increases in the house's value over time, was included in exhibits admitted at trial, but trial exhibits were not included in our record.

primary custody of J.W.F., and he would spend alternating weekends with Joshua. The trial court did not explain its decision, except to say, "Dad and [J.W.F.'s] relationship is pretty seriously broken." VRP at 572.

Second, the trial court said that for the two younger children, A.B.F. and J.P.F., Mary and Joshua would split 50/50 custody, with Joshua being the designated custodian for "federal purposes." VRP at 574. The trial court did not further elaborate in its oral ruling on why it awarded the parents 50/50 custody.

Finally, with respect to asset distribution, the trial court determined that the house was Joshua's separate property. The trial court explained that the couple was not in a committed intimate relationship when the property was purchased and Mary did not provide any evidence that she financially contributed to the down payment or the costs to build the house. The trial court specifically stated,

> I heard no testimony about sources of down payments or where anything else came from. All I have is the information that there was these -- the various mortgages, the loans that were taken out; again, first, by Mr. Fleming and then when Ms. Fleming was added later on.

> So there's no marital interest here because I find that there was no committed intimate relationship prior to the date of marriage. There were too many breakups and living in other places. It's just not the type of committed intimate relationship that would mean that all of the property is all community. We just don't have that situation.

VRP at 579. Thus, the trial court distributed the house and its associated debt from the mortgage to Joshua as his separate property, resulting in Joshua receiving all of the benefit of the equity in the family home, as much as $300,000.

In addition to the house, the trial court distributed three of the four vehicles to Joshua: a Chevrolet truck, a Ford Fusion, and an Acura. Mary received the Chevrolet Tahoe, along with the debt associated with the Tahoe.

At the end of its oral comments, the trial court addressed the substantial equity Joshua received by getting the house. To "offset" that equity and in recognition of the fact that the marital community made payments on the house for years, the trial court gave Joshua all of the couple's unsecured debt, including those from credit cards and person loans. VRP at 580.

At the close of the ruling, Mary questioned the decision to give the house to Joshua as separate property. The trial court explained its decision again, emphasizing that it was trying to come to an equitable solution and that Mary did not provide any evidence that the house was community property. The following colloquy took place:

> MS. FLEMING: So I would not be able to buy a house for quite a long time. And he's -- he gets all the house equity, is that what you're saying?
>
> THE COURT: It's separate property.
>
> MS. FLEMING: Okay.
>
> THE COURT: Just by law, it's separate property.
>
> MS. FLEMING: Okay.
>
> THE COURT: But that's why he's getting all the debt too.
>
> MS. FLEMING: Okay.
>
> THE COURT: All right? So cash flow issue. This isn't perfect for anybody. I know this is lousy. It's lousy for both of you, you know. But you put that in my hands, and that's the best I can come up with to be as equitable as I can. You know, I'm sure you walk out of here, both of you are going to be going, Ouch. That wasn't what I wanted to have happen. But I can only deal with the facts that you gave me.

No. 57782-8-II

VRP at 584.

A few weeks later, the trial court entered the final parenting plans and "Findings and Conclusions about a Marriage" for the distribution of assets. Clerk's Papers (CP) at 1955.

The written parenting plan for custody of A.B.F and J.P.F. reflected the trial court's oral decision for Mary and Joshua to split custody 50/50. Despite the order for 50/50 custody, the parenting plan did not explain the decision for that allocation of parenting time. The parenting plan only included the following statements on limitations for parenting time:

> 3. Reasons for putting limitations on a parent (under RCW 26.09.191)
>
>     a. Abandonment, neglect, child abuse, domestic violence, assault, or sex offense.
>
> Neither parent has any of these problems.
>
>     b. Other Problems that may harm the children's best interests:
>
> Neither parent has any of these problems.
>
> 4. Limitations on a parent
>
> Does not apply. There are no reasons for limitations checked in 3.a. or 3.b. above.

CP at 1939-40. The parenting plan for J.W.F. repeated the same statements with no further explanation.

The Findings and Conclusions About a Marriage reflected the trial court's oral comments on the distribution of assets. The Findings and Conclusions reiterated that the distribution was just and equitable and included an attached "Exhibit A" with all of the assets and how they were to be split. CP at 1957. Neither the Findings and Conclusions nor Exhibit A broke down the numerical values of the various assets and debts distributed to Mary and Joshua.

7

Mary appeals the trial court's parenting plans and the distribution of assets in the Findings and Conclusions.

## ANALYSIS

### I. CHALLENGE TO PARENTING PLAN ORDERS

Mary argues that the trial court erred by failing to issue sufficient findings of fact and conclusions of law to explain its child custody decisions in the parenting plans. And Mary argues the trial court's oral ruling was also insufficient to explain the custody decisions. We agree.

Trial courts are required to enter findings of fact and conclusions of law for child custody decisions. CR 52(a)(2)(B). The civil rules specifically state,

(2) *Specifically Required*. Without in any way limiting the requirements of subsection (1), findings and conclusions are required:

. . . .

(B) Domestic relations. In connection with all final decisions in adoption, custody, and divorce proceedings, whether heard ex parte or not.

CR 52(a).

" '[W]here findings [of fact] are required, they must be sufficiently specific to permit meaningful review.' " *In re Dependency of A.D.*, 193 Wn. App. 445, 462, 376 P.3d 1140 (2016) (first alteration in original) (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.3d 138 (1986)). "When the findings are not 'sufficiently specific,' appellate courts will remand to the trial court." *Id.* at 462-63 (quoting *State v. Barber*, 118 Wn.2d 335, 345, 823 P.2d 1068 (1992)).

In making decisions on child custody, the trial court must consider specific factors identified by statute. RCW 26.09.187(3)(a). The trial court must consider the following factors, with the first factor bearing the most weight:

(i)  The relative strength, nature, and stability of the child's relationship with each parent;

(ii)  The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii)  Each parent's past and potential for future performance of parenting functions as defined in *RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv)  The emotional needs and developmental level of the child;

(v)  The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi)  The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii)  Each parent's employment schedule, and shall make accommodations consistent with those schedules.

RCW 26.09.187(3)(a).  The court's written order should reflect a consideration of the factors, but if the written order fails to do so, the court's oral ruling must.  *See In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981) ("When written findings of fact do not clearly reflect a consideration of the statutory factors, resort can be made to the court's oral opinion.").

Mary argues that the trial court failed to either issue written findings or make an oral ruling that shows it contemplated the statutory factors.  Mary requests, at a minimum, that we remand to the trial court for the entry of sufficient findings of fact and conclusions of law.  Joshua responds that even if the trial court failed to issue sufficient written findings of fact and conclusions of law, the evidence presented to the trial court, together with its oral comments, shows the trial court adequately considered the statutory factors.

9

Here, the question is whether the trial court's parenting plan orders or oral comments are adequate to permit meaningful review of whether the trial court appropriately considered the statutory factors under RCW 26.09.187. We conclude they are not.

In its parenting plans, the trial court assigned custody of A.B.F. and J.P.F. as 50/50 to Mary and Joshua, and primary custody of J.W.F. to Mary (with J.W.F. staying with Joshua every other weekend). The trial court's written parenting plans do not explain the reasoning for these arrangements; the only statements that could be construed as a finding of fact are the determinations that "[n]either parent has any . . . problems" with "[a]bandonment, neglect, child abuse, domestic violence, assault, [] sex offense[s]" or any "[o]ther problems that may harm the children's best interests." CP at 1939, 1947. And the trial court's oral comments are similarly lacking in explanation, other than when the trial court stated that Joshua and J.W.F.'s relationship was "seriously broken." VRP at 572. These statements fall short of showing that the trial court considered the factors required by RCW 26.09.187.[3]

---

[3] Although we might have confidence that the statutory factors *were* considered where, as here, an experienced trial judge is making the decision following a contested multi-day bench trial, we are still unable to undertake a " 'meaningful review' " of that decision without an oral explanation or adequate findings and conclusions. *See In re Dependency of A.D.*, 193 Wn. App. at 462-63 (quoting *In re Det. of LaBelle*, 107 Wn.2d at 218).

We remand for the trial court to make findings of fact and conclusions of law under CR 52(a)(2)(B) that show its consideration of the factors in RCW 26.09.187.[4]

II. DIVISION OF PROPERTY

Mary next argues that the trial court erred in distributing their house to Joshua as separate property. Mary makes three main arguments related to the house: (1) the trial court erred in determining that she and Joshua were not in a committed intimate relationship before they were married, (2) the house either initially was or eventually became community property, and (3) the distribution of the house to Joshua was not just and equitable.

We affirm the trial court's determinations that Joshua and Mary were not in a committed intimate relationship before they were married and that the house was separate property. But because the trial court did not provide sufficient valuations of the debts and assets distributed to Joshua and Mary, we are unable to determine whether the trial court's property distribution was just and equitable. Thus, on remand, the trial court should address in more detail its valuation of the property and its consideration of the factors related to a just and equitable distribution, and the court may revisit the property distribution as necessary in light of this opinion.

---

[4] Separate from Mary's argument about the adequacy of the findings of fact and conclusions of law, she also appears to substantively challenge the trial court's decision to split custody 50/50 for A.B.F. and J.P.F. Mary argues that Joshua exhibited abusive behavior towards the children and that the trial court, therefore, should have restricted his parenting time. But, again, we are unable to meaningfully review the trial court's decision. And we decline the invitation to make our own evaluation of the record which would, by necessity, require us to make credibility determinations and second-guess the trial court's conclusion that "[n]either parent has any . . . problems" with abuse. CP at 1939.

11

A. MARY AND JOSHUA WERE NOT IN A COMMITTED INTIMATE RELATIONSHIP

Mary's first argument for her share of the house is that she was in a "committed intimate relationship" with Joshua when the house was acquired. Opening Br. of Appellant at 34. Whether the parties had a committed intimate relationship presents a mixed question of law and fact. *In re Committed Intimate Relationship of Muridan*, 3 Wn. App. 2d 44, 54, 413 P.3d 1072, *review denied*, 191 Wn.2d 1002 (2018). We review the trial court's conclusion of whether the parties' relationship was a committed intimate relationship de novo. *Id.* But we defer to the trial court's unchallenged factual findings. *Id.*

Washington courts recognize that two individuals in a "committed intimate relationship" may both have an interest in property acquired during the relationship. *Id.* at 55. "Upon determining that a [committed intimate relationship] existed, courts may distribute property acquired during the relationship that would be treated as community property were the parties legally married." *Id.* at 56.

A committed intimate relationship "is a 'stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist.' " *Id.* at 55 (quoting *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)). "The [committed intimate relationship], based on equitable principles, protects the interests of unmarried parties who acquire property during their relationship by preventing the unjust enrichment of one at the expense of the other when the relationship ends." *Id.*

Courts will consider the following non-exclusive factors to determine whether a committed intimate relationship existed: "(1) continuity of cohabitation, (2) 'duration of the relationship,' (3) 'purpose of the relationship,' (4) 'pooling of resources and services for joint projects,' and (5) 'the

intent of the parties.' " *Id.* (quoting *Connell*, 127 Wn.2d at 346). "Courts should not apply these factors in a hypertechnical fashion, but must base the determination on the circumstances of each case." *Id.*

Here, the trial court determined that Mary and Joshua were not in a committed intimate relationship before they were married. The trial court emphasized in its oral explanation that it factually determined that Mary and Joshua had separated multiple times. This, according to the trial court, showed that their relationship did not amount to a committed intimate relationship. We agree.

The testimony from both parties shows that Mary and Joshua separated multiple times throughout their relationship, including in 2005, 2006, and after they moved into the finished house. And when their house was initially being built in 2006, they were not living together— Joshua was living with his mother and Mary lived in an apartment. The couple did not maintain a joint bank account at that time. Further, the trial court found that Mary failed to establish that she contributed toward the down payment for or other costs to build the house and, thereby, failed to show that she and Joshua were pooling resources.[5] At most, Mary's testimony supports that the couple both paid for costs like bills, rent, and groceries.

Thus, at the time the property was acquired, the two had recently been separated, were not cohabitating, did not pool resources, and did not appear to be in a relationship with lasting duration

---

[5] In her opening brief, Mary argues that she established during the trial that she contributed toward the costs of the house. But Mary's citations to the record support that she contributed toward things *other than* the building of the house, such as household expenses, bills, and (sometime later) mortgage payments. We acknowledge that Mary may have supported the household, but there is sufficient evidence for the trial court's oral finding that Mary failed to establish she contributed toward the down payment or costs to actually build the house.

(even though they had a child together). From these facts, the trial court did not err when it determined that Mary and Joshua were not in a committed intimate relationship during the purchase of the plot and building of the house.

## B. HOUSE WAS NOT COMMUNITY PROPERTY

Mary's second argument for her share of the house is that she and Joshua intended for the house to be community property. Mary appears to argue that the house was community property at the outset because community funds were used to build the house. Mary argues this initial intent is shown, in part, by the fact that the post-build refinancings included her credit and that her name was later included on the deeds. Even if the house was initially separate property, Mary seems to argue that her inclusion on these post-build refinancings transitioned the house to community property. We disagree.

"A trial court's characterization of property as separate or community presents a mixed question of law and fact." *In re Marriage of Kile*, 186 Wn. App. 864, 876, 347 P.3d 894 (2015). For example, " '[t]he time of acquisition, the method of acquisition, and the intent of the donor, for example, are questions for the trier of fact.' " *Id.* (quoting *In re Marriage of Martin*, 32 Wn. App. 92, 94, 645 P.2d 1148 (1982)). When those facts are challenged, we review them for substantial evidence. *Id.* We do not substitute our judgement for that of the trial court, weigh the evidence, or adjudge witness credibility. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007), *review denied*, 163 Wn.2d 1055 (2008). But "[t]he ultimate characterization of the property as community or separate is a question of law that we review de novo." *In re Marriage of Kile*, 186 Wn. App at 876.

"[T]he character of property as separate or community property is determined at the date of acquisition." *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). "Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Id.*

Adding a spouse to the deed of a property does not automatically convey an intent for the separate property to be transmuted into community property; it merely conveys an intent for the added spouse to be on the deed. *Id.* at 489. The rule governing whether an item is community property is "whether it was acquired by community funds and community credit," rather than separate funds. *See, e.g.*, *In re Estate of Binge*, 5 Wn.2d 446, 484, 105 P.2d 689 (1940).

Here, Mary appears to assert that the house was purchased using funds from both parties, showing the parties intended for the house to be community property. But her evidence is limited. She only supports this assertion with her own testimony and unrelated testimony from Joshua about splitting bills before one of the couple's separations and about the couple moving back in together after a separation. And the trial court did not find this presented evidence convincing; it explained in its oral ruling that Mary failed to show she contributed to the down payment or other funding. To the extent that Mary challenges the trial court's finding that she did not contribute financially to building the house, the trial court's finding is supported by the record. And to the extent the trial court's evaluation of Mary's testimony was rooted in its credibility determination of her testimony, we defer to the trial court's assessment of credibility. *In re Marriage of Rockwell*, 141 Wn. App. at 242. Thus, Mary has not shown that the house was initially community property.

Even if the house was not initially community property, Mary appears to argue that the house *became* community property when she was added to the deed to the house during the multiple refinancings. Mary claims that because her credit was also used for the refinancing, the couple intended that the house would transition into community property.

This position is unpersuasive. The rule for determining community property is whether the item was "acquired by community . . . credit." *In re Estate of Binge*, 5 Wn.2d at 484. Mary admits that Joshua independently used his own credit to *acquire* the initial construction loan for the house. By the time Mary's credit was in use, the house had long-since been acquired. And the inclusion of Mary on the deed may have been a necessity by the lender to support the refinancing; it, by itself, did not establish an intent for the house to become community property. *See In re Estate of Borghi*, 167 Wn.2d at 489. Without further evidence that Mary and Joshua intended for the house to become community property, the house remains in the same character in which it originated—separate property. On this record, the trial court did not err when it determined that the house was Joshua's separate property.

## C. DISTRIBUTION OF ASSETS

Finally, Mary's third argument for a portion of the value of the house is that its distribution to Joshua in its entirety was not just and equitable. Because neither the trial court's written nor oral ruling about the distribution of property included valuations, we are unable to determine whether the trial court's distribution was just and equitable. Thus, we remand for the trial court to enter findings that would enable us to make such a determination. And the trial court is free to revisit the property distribution if necessary.

When distributing assets in a dissolution proceeding, the trial court must make allocations in a manner that is just and equitable. RCW 26.09.080. The trial court must consider the following non-exhaustive list of factors:

(1) The nature and extent of the community property;

(2) The nature and extent of the separate property;

(3) The duration of the marriage or domestic partnership; and

(4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

RCW 26.09.080.

The trial court enjoys broad discretion to make a just and equitable distribution of property based on these factors. *In re Marriage of Wright*, 179 Wn. App. 257, 261, 319 P.3d 45 (2013), *review denied*, 180 Wn.2d 1016, 186 Wn.2d 1017 (2014). We will only reverse the distribution of marital assets if the trial court manifestly abused its discretion. *Id.*

"[A]ll property, both community and separate, is before the trial court for distribution." *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972) (emphasis omitted). "Its characterization as community, or separate, though significant, is not necessarily controlling." *Id.* And the distribution need not be equal. *Id.*

Appellate review of whether a trial court's distribution was just and equitable requires that the trial court explain its valuation of the assets and debts. *In re Marriage of Greene*, 97 Wn. App. 708, 712, 986 P.2d 144 (1999) ("The trial court is required to value the property to create a record for appellate review."). Considering that the valuation of the property in a dissolution is a "material

fact," a trial court should explain its valuation of the property within the context of the RCW 26.09.080 factors so we can review whether the distribution is just and equitable. *See id.*; *In re Marriage of Martin*, 22 Wn. App. 295, 296, 298, 588 P.2d 1235 (1979) (remanding distribution of assets back to the trial court when it did not make findings on the values or character of distributed assets to support the factors required to be considered in RCW 26.09.080).

There is a presumption that any increase in value of separate property is likewise separate in nature. *In re Marriage of Lindemann*, 92 Wn. App. 64, 69, 960 P.2d 966 (1998), *review denied*, 137 Wn.2d 1016 (1999). But if there is evidence of an increase in value of separate property that is attributable to community labor or funds, "the community may be equitably entitled to reimbursement for the contributions that caused the increase in value." *Id*. at 70. In other words, the calculation of a just and equitable distribution of separate property may include whether community funds or labor went to improving the value of the separate property. *See In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865-66, 855 P.2d 1210 (1993) (considering whether community funds were used to increase value of separate real property for just and equitable distribution of assets); *In re Marriage of Elam*, 97 Wn.2d 811, 816-17, 650 P.2d 213 (1982) (determining distribution was fair and equitable when the trial court considered the community's improvement to one spouse's separate property house for award to other spouse); *In re Marriage of Johnson*, 28 Wn. App. 574, 579, 625 P.2d 720 (1981) (court remanded for reconsideration of the fairness and equity in property distribution when interest gained in separate property was mischaracterized as a community asset).

Here, the trial court correctly determined that the house was Joshua's separate property. The trial court then distributed the house and its remaining mortgage debt entirely to Joshua. The trial court appeared to offset this value by distributing to Joshua all of the couple's community credit card and personal loan debt, while Mary received her personal property in her possession and the Tahoe and its associated loan debt.

However, the trial court did not explain these distributions with reference to their valuations. And it is unclear from the record whether the trial court adequately considered the complexity of the community contributions to the value of the house. Not only was the house refinanced multiple times, but an addition was also constructed, likely with community resources, which may have greatly affected the house's value. It is possible these complexities may not have been incorporated into the property distribution.

But at this point, we cannot evaluate the fairness of this property distribution because neither the trial court's written orders nor oral rulings explain its valuation of the assets and debts. We therefore remand to the trial court to enter findings of fact and conclusions of law that include the values of the assets and debts distributed to the parties and explain its consideration of the RCW 26.09.080 factors that would enable appellate review. The trial court may revisit the property distribution as necessary in light of this opinion.

CONCLUSION

We affirm the trial court's determinations that the house was Joshua's separate property. But we remand to the trial court to enter more detailed findings of fact and conclusions of law related to its parenting plans and distribution of property.

19

No. 57782-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

GLASGOW, J.